EXHIBIT A

INMATE REQUEST TO STAFF  CDFRM

U.S. DEPARTMENT OF                                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member)<br>Warden Williams | DATE:<br>11/10/2023 |
|---|---|
| FROM:<br>Keven Wyrick | REGISTER NO.:<br>08724-045 |
| WORK ASSIGNMENT:<br>UNICOR | UNIT:<br>L/W |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request. I'm requesting that the Director of the BOP submit a motion on my behalf for a sentence reduction pursuant to 18 U.S.C. §3582(c)(1)(A) for the reasons stated herein: (1) changes in the law (including U.S. v. Booker concerning mandatory Guidelines application); (2)sentencing disparity related to changes in the law; (3) my age at the time of the offenses I was convicted of; (4) my extensive rehabilitation; (5) my unusually long sentence as a result of sentencing disparity; and (6) I was charged with both CCE and the lessor included offense of conspiracy resulting in unlawful convictions for both offenses (creating another sentencing disparity). **HOME PLAN:** My home plan involves my living with my sister, Theresa Gray at her home address of 705 Fir St., Garden City, Missouri 64747. **MEDICAL EXPENSES:** My medical expenses will be covered by the VA as I am a military veteran.

*** If any additional information is needed please let me know. ***
(There is no local prison policy posted as to how to submit a motion for a sentence reduction to the warden in contravention of 28 CFR 571.60).

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate

PDF

Prescribed by P5511

This form replaces BP-148.070 dated Oct 86 and BP-3148.070 APR. 94

i"l'li!ftE IN SECTION 6 UNLESS APPROPRIATE FOR f'mlifiiJAll: OLDER        SECTION  6

**EXHIBIT B**

```
REGISTER NO: 08724-045     NAME..: WYRICK           FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: ENG-ENGLEWOOD FCI
```

```
-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
ENG  ESL HAS   ENGLISH PROFICIENT        06-12-1997 1541 CURRENT
ENG  GED HAS   COMPLETED GED OR HS DIPLOMA 06-30-1997 1845 CURRENT
```

```
--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL   DESCRIPTION                  START DATE STOP DATE EVNT AC LV HRS
ENG VETS   RPP #1 HIV/AIDS AWARENESS    07-13-2023 CURRENT
ENG VETS   JOB PREP CLASS               09-25-2023 CURRENT
ENG VETS   RELEASE PLAN                 09-25-2023 CURRENT
ENG        ACE SS: FAMILY REUNIFICATION 10-01-2023 10-31-2023  P  C  P    2
ENG        ACE SELF JOB SUCCESS         10-01-2023 10-31-2023  P  C  P    1
ENG VETS   ACE SELF LAWS SELF CONFIDENCE 09-01-2023 09-30-2023  P  C  P    2
ENG        TRANS WORK & SELF-SUFFICIENCY 09-01-2023 09-30-2023  P  C  P    3
ENG        ACE SELF COMMUNICATION SKILLS 09-01-2023 09-30-2023  P  C  P    2
ENG        ACE SS: FAMILY REUNIFICATION 09-01-2023 09-30-2023  P  C  P    2
ENG VETS   WORKPLACE COMMUNICATION      09-01-2023 09-30-2023  P  C  P    1
ENG VETS   ACE SELF GOALS AND BARRIERS  09-01-2023 09-30-2023  P  C  P    1
ENG VETS   EXPERT JOB SEARCH STRATEGIES 09-01-2023 09-30-2023  P  C  P    1
ENG VETS   ACE SELF PRODUCTIVITY        09-01-2023 09-30-2023  P  C  P    2
ENG VETS   ACE COUNTDOWN TO FREEDOM     09-01-2023 09-30-2023  P  C  P    2
ENG VETS   ACE SELF ART OF COMMUNICATION 09-01-2023 09-30-2023  P  C  P    1
ENG VETS   ACE SELF HOME BUSINESS       08-01-2023 08-31-2023  P  C  P    1
ENG VETS   ACE SELF AFTER PRISON REAL WLD 08-01-2023 08-31-2023  P  C  P    1
LVN        RPP6 LCP SPIRITUALITY        03-24-2021 05-26-2021  P  C  P   20
LVN        ADVANCED CORE EXERCISE CLASS 05-20-2021 06-29-2021  P  C  P    2
LVN        RPP6 LCP RELIGIOUS TOLERANCE 06-15-2020 07-13-2020  P  C  P   14
LVN        RPP6 LCP MANAGING EMOTIONS   07-27-2020 09-01-2020  P  C  P   20
LVN        RPP6 LCP CONFLICT MANAGEMENT 09-14-2020 10-30-2020  P  C  P   20
LVN        RPP6 LCP OBLG RIGHT TO WRONG 12-08-2019 01-08-2021  P  C  P   20
LVN        RPP6 LCP FOLLOW MORAL COMPASS 01-11-2021 02-04-2021  P  C  P   16
LVN        RPP6 LCP FAMILY LIFE CONNECT 02-08-2021 03-04-2021  P  C  P   32
LVN        RPP6 LCP LEADERSHIP          03-08-2021 04-01-2021  P  C  P   16
LVN        RPP6 LCP TRANSITIONAL ISSUES 04-05-2021 04-30-2021  P  C  P   20
LVN        FAITH SPECIFIC               04-05-2021 04-30-2021  P  C  P   20
LVN        RPP6 LCP SPIRITUALITY        04-20-2021 06-01-2020  P  C  P   24
LVN        RPP6 LCP CELEBRATE RECOVERY  08-28-2020 10-15-2020  P  C  P   20
LVN        ACE PROFESSIONAL WRITING     08-20-2020 10-22-2020  P  C  P   10
LVN        RPP6 LCP PREP FOR JOURNEY    02-25-2020 03-20-2020  P  C  P   24
LVN        RPP6 LCP BUILDING BLOCKS/COMM 01-14-2020 02-21-2020  P  C  P   20
LVN        RPP6 LCP ORIENTATION         12-03-2019 01-10-2020  P  C  P   16
LVN        RPP6 LCP COMFORT ZONE RETREAT 11-18-2019 11-29-2019  P  C  P   18
LVN        ACE- SIGN LANGUAGE 2         01-03-2020 03-20-2020  P  C  P   10
LVN        CANTERBURY TALES ACE COURSE  09-25-2019 01-31-2020  P  C  P   10
LVN        DEBATE ACE CLASS             09-26-2019 01-23-2020  P  C  P   10
LVN        BASKETBALL OFFICIATING       12-07-2019 01-20-2020  P  C  P    6
LVN        ACE- SIGN LANGUAGE 2         11-01-2019 12-20-2019  P  C  P   10
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

REGISTER NO: 08724-045      NAME..: WYRICK                    FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: ENG-ENGLEWOOD FCI

---------------------------- EDUCATION COURSES ----------------------------

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|------------|-----------|------|----|----|----|
| LVN | ADVANCED YOGA | 11-19-2019 | 11-20-2019 | P | C | P | 2 |
| LVN | ACE AMERICAN SIGN LANGUAGE | 06-28-2019 | 09-06-2019 | P | C | P | 20 |
| LVN | BEGINNING YOGA & STRETCHING | 09-18-2019 | 10-01-2019 | P | C | P | 2 |
| LVN | TUTOR TRAINING COURSE | 07-17-2019 | 08-05-2019 | P | C | P | 10 |
| MAR GP | CERTIFIED PRODUCTION TECH VT | 02-15-2017 | 10-18-2017 | P | C | C | 140 |
| MAR GP | REENTRY SIMULATION | 09-14-2017 | 09-14-2017 | P | C | P | 2 |
| MAR GP | RE-ENTRY ADV CAREER SEARCH | 01-19-2017 | 03-21-2017 | P | C | P | 8 |
| MAR GP | INFORMATION PROCESSING VT 1200 | 04-11-2016 | 03-14-2017 | P | C | C | 300 |
| MAR GP | ACE COMPUTER KEYBOARDING 3 | 09-14-2016 | 11-02-2016 | P | C | P | 8 |
| MAR GP | ACE COMPUTER KEYBOARDING 2 | 09-14-2016 | 11-02-2016 | P | C | P | 8 |
| MAR GP | ANTHROPOLOGY ACE CLASS | 09-15-2016 | 11-03-2016 | P | C | P | 8 |
| MAR GP | U.S. HISTORY VIDEO ACE CLASS | 09-12-2016 | 11-07-2016 | P | C | P | 8 |
| MAR GP | BEYOND BARS #6 | 08-31-2016 | 09-22-2016 | P | C | P | 6 |
| MAR GP | ACE COMPUTER KEYBOARDING 1 | 04-07-2016 | 05-27-2016 | P | C | P | 8 |
| MAR GP | ADVANCED NUTRITION | 01-11-2016 | 03-14-2016 | P | C | P | 10 |
| MAR GP | PHYSIOLOGY CLASS | 01-20-2016 | 03-16-2016 | P | C | P | 9 |
| MAR GP | ACE CLASS - LEGAL RESEARCH | 01-13-2016 | 03-02-2016 | P | C | P | 8 |
| MAR GP | ACE CLASS SPANISH 2 | 01-04-2016 | 03-03-2016 | P | C | P | 8 |
| MAR GP | MONEY SMART PERSONAL FINANCE | 01-03-2016 | 03-03-2016 | P | C | P | 8 |
| MAR GP | CDL MANUAL STUDY ACE CLASS | 10-19-2015 | 12-10-2015 | P | C | P | 8 |
| MAR GP | ACE CLASS - BEGINNING SPANISH | 10-19-2015 | 12-10-2015 | P | C | P | 8 |
| MAR GP | HOME IMPROVEMENT 1 ACE CLASS | 01-27-2015 | 03-27-2015 | P | C | P | 8 |
| MAR GP | ELECTRICAL THEORY | 01-26-2015 | 03-26-2015 | P | C | P | 8 |
| MAR GP | ACE-SMALL BUSINESS DEVELOPMENT | 01-26-2015 | 03-26-2015 | P | C | P | 8 |
| MAR GP | ACE HOME PLUMBING SYSTEMS MNTN | 01-28-2015 | 03-28-2015 | P | C | P | 8 |
| MAR GP | ACE CLASS - LEGAL RESEARCH | 10-15-2014 | 12-15-2014 | P | C | P | 8 |
| MAR GP | PARALEGAL CAREERS ACE CLASS | 10-15-2014 | 12-15-2014 | P | C | P | 8 |
| MAR GP | ACE LEGAL WRITING | 10-22-2014 | 12-22-2014 | P | C | P | 8 |
| MAR GP | PIANO LEISURE CLASS | 01-26-2014 | 03-23-2014 | P | C | P | 20 |
| MAR GP | NUTRITION CLASS | 04-15-2013 | 06-10-2013 | P | C | P | 9 |
| MAR GP | INSANITY FITNESS CLASS | 01-18-2012 | 03-15-2012 | P | C | P | 2 |
| MAR GP | CIRCUIT TRAINING CLASS | 01-18-2012 | 03-15-2012 | P | C | P | 2 |
| MAR GP | ACE ELECTRONIC LAW LIBRARY | 01-18-2011 | 05-05-2011 | P | C | P | 8 |
| ALM | CORRESPNDENCE SCHOOL FLEX TIME | 03-26-2010 | 06-01-2010 | P | C | P | 2250 |
| ALM | CORRESPNDENCE SCHOOL FLEX TIME | 09-22-2009 | 03-26-2010 | P | C | P | 1845 |
| ALM | ACE VT TRADES REVIEW | 09-26-2009 | 12-07-2009 | P | C | P | 14 |
| ALM | CORRESPNDENCE SCHOOL FLEX TIME | 06-04-2009 | 09-22-2009 | P | C | P | 900 |
| ALM | BEGINNING GUITAR CLASS IN REC | 08-19-2009 | 09-07-2009 | P | C | P | 1 |
| ALM | ACE REAL ESTATE CLASS | 06-12-2008 | 07-29-2008 | P | C | P | 16 |
| ALM | CORRESPNDENCE SCHOOL FLEX TIME | 05-01-2008 | 05-01-2008 | P | C | P | 15 |
| ALM | BRIANS SONG ACE NOVEL | 12-06-2007 | 12-10-2007 | P | C | P | 10 |
| ALM | THE CONTENDER ACE NOVEL | 12-06-2007 | 12-10-2007 | P | C | P | 10 |
| ALM | THE OUTSIDERS NOVEL CLAS | 11-30-2007 | 12-03-2007 | P | C | P | 10 |
| ALM | TPC READING BLUEPRINTS | 11-23-2007 | 11-29-2007 | P | C | P | 25 |
| ALM | T,W,TH 12:00-3:30 VT COMPUTERS | 06-07-2007 | 11-08-2007 | P | C | C | 180 |

G0002       MORE PAGES TO FOLLOW . . .

```
REGISTER NO: 08724-045      NAME..: WYRICK               FUNC: PRT
FORMAT.....: TRANSCRIPT      RSP OF: ENG-ENGLEWOOD FCI
```

---------------------------- EDUCATION COURSES ----------------------------

| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT | AC | LV | HRS |
|----------|-------------|-----------|-----------|------|----|----|----|
| POL | USP PHYSICAL FITNESS & HEALTH | 08-29-2006 | 10-31-2006 | P | C | P | 20 |
| POL | USP BEST 2 WAYS TO FIND A JOB | 10-31-2006 | 10-31-2006 | P | C | P | 1 |
| POL | USP WHY SHOULD I HIRE YOU | 10-24-2006 | 10-24-2006 | P | C | P | 1 |
| POL | USP COMPLETE JOB APPLICATION | 10-17-2006 | 10-17-2006 | P | C | P | 1 |
| POL | SKILLS IDENTIFICATION | 10-10-2006 | 10-10-2006 | P | C | P | 1 |
| POL | USP PREPARING FOR SUCCESS | 09-28-2006 | 09-28-2006 | P | C | P | 1 |
| POL | USP PUTING THE BARS BEHIND YOU | 09-26-2006 | 09-26-2006 | P | C | P | 1 |
| POL | MICROCOMPUTER APPLICATIONS | 05-26-2006 | 09-29-2006 | P | C | C | 201 |
| POL | MS ACCESS 7:30A-10:30A | 09-01-2006 | 09-29-2006 | C | C | P | 0 |
| POL | USP BEST 2 WAYS TO FIND A JOB | 09-19-2006 | 09-19-2006 | P | C | P | 1 |
| POL | ADV PIANO CLASS SAT-SUN 8-930A | 06-11-2006 | 09-17-2006 | P | C | P | 24 |
| POL | MS EXCEL 7:30A-10:30A | 07-13-2006 | 09-01-2006 | C | C | P | 0 |
| POL | MICROSOFTWORD M-F 7:30-10:30AM | 05-26-2006 | 07-13-2006 | C | C | P | 0 |
| POL | KEYBOARDING 7:30A-10:30A | 04-20-2006 | 05-26-2006 | P | C | P | 60 |
| POL | USP PIANO CLASS SAT-SUN 8-930A | 12-15-2005 | 03-11-2006 | P | C | P | 12 |
| POL | BRIEF WRITING MONDAY 630-730P | 11-07-2005 | 12-20-2005 | P | C | P | 12 |
| POL | COURT RULES RESCH SA 130-300P | 11-12-2005 | 12-24-2005 | P | C | P | 12 |
| LVN | CAGE YOUR RAGE USP | 02-06-2004 | 12-20-2005 | P | C | P | 1 |
| POL | USP/STRESS LESS 6 HRS | 10-28-2005 | 12-09-2005 | P | C | P | 6 |
| LVN | GRAPHICS ARTS 12:30-2:00PM M-F | 11-17-1997 | 07-20-1998 | P | W | V | 123 |

G0000        TRANSACTION SUCCESSFULLY COMPLETED

**EXHIBIT C**

Calvary Christian College Seminary

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the Board of Directors

Kevin Lee Dirik

CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

Having honorably and successfully completed the prescribed requirements of

DOCTOR OF THEOLOGY

Awarded this 15th day of February, 2011 A.D.

Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, Board of Reference

Rev. Robert L. Johnston, Dean Emeritus

Dr. Kenneth F. Pierpont, Th.D.

# Calvary Christian College and Seminary

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the
Board of Directors

## Kent Lee Dirk

Having honorably and successfully completed the prescribed requirements of
CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## DOCTOR OF PHILOSOPHY IN THEOLOGY

Awarded this 21st day of February, 2012 A.D.

_Dr. Jack Van Impe, Board of Reference_

_Dr. Michael L. Johnston, Board of Reference_

_Rev. Robert L. Johnston, Dean Emeritus_

_Dr. Kenneth F. Pierpont, Access._

# CALVARY CHRISTIAN COLLEGE & SEMINARY

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the

Board of Directors

## THIS CERTIFIES THAT

## Kevin Lee Wyrick

Having honorably and successfully completed the prescribed requirements of

CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## MASTER OF BIBLICAL STUDIES

Awarded this 21st day of May, 2010 A.D.



Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, President

Rev. Robert L. Johnston, Dean Emeritus

# Calvary Christian College and Seminary

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the Board of Directors

### Kuen Lee, Uprik

Having honorably and successfully completed the prescribed requirements of CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## MASTER OF THEOLOGY

Awarded this 15th day of January, 2011 A.D.



Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, Board of Reference

Rev. Robert L. Johnston, Dean Emeritus

Dr. Kenneth F. Pierpont, CCC&S Board

# CALVARY CHRISTIAN COLLEGE & SEMINARY

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the

Board of Directors

THIS CERTIFIES THAT

## Keven Lee Wyrick

Having honorably and successfully completed the prescribed requirements of

CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## COUNSELOR OF BIBLICAL STUDIES

Awarded this 29th day of July, 2009 A.D.

Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, President

Rev. Robert L. Johnston, Dean Emeritus

# CALVARY CHRISTIAN COLLEGE & SEMINARY

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the

Board of Directors

THIS CERTIFIES THAT

## Keven Lee Wyrick

Having honorably and successfully completed the prescribed requirements of

CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## BACHELOR OF BIBLICAL STUDIES

Awarded this 20th day of March, 2010 A.D.

Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, President

Rev. Robert L. Johnston, Dean Emeritus



# CALVARY CHRISTIAN COLLEGE & SEMINARY

SOUTH BEND, INDIANA

On the recommendation of the faculty and upon the approval of the

Board of Directors

THIS CERTIFIES THAT

## Kevon Lee Wyrick

Having honorably and successfully completed the prescribed requirements of
CALVARY CHRISTIAN COLLEGE & SEMINARY is hereby entitled to the DEGREE of

## ASSOCIATE OF BIBLICAL STUDIES

Awarded this 29th day of September, 2009 A.D.

Dr. Jack Van Impe, Board of Reference

Dr. Michael L. Johnston, President

Rev. Robert A. Johnston, Dean Emeritus

Dr. K———

CALVARY CHRISTIAN COLLEGE AND SEMINARY
PMI CENTER FOR BIBLICAL STUDIES
PO# 177 Battle Creek, MI 49016-0177

DATE DRAFTED:
Keven Wyrick 08724-045
US Penitentiary Marion
PO Box 1000
Marion, IL 62959
DATE: 9/21/2011

ENROLLED: 2/20/2009
PROGRAM: Bible

NOT OFFICIAL TRANSCRIPT WITHOUT SIGNATURE AND SEAL

| | DATE: | 7/29/2009 | | | LICENSED: 7/29/2009 | ORDAINED: | | Tran Copies: |
| DEGREE: | | CBS | ABS | GBS | BBS | MBS | DBS | PMI EVANG: |
| DATE | | 7/29/2009 | 9/29/2009 | 1/4/2010 | 3/20/2010 | 5/21/2010 | 10/15/2010 | |

| COMP | COURSE TITLE | A/S CRDTS | TOT CRDTS | HOURS | GRADE |
|---|---|---|---|---|---|
| | PMI CRDTS | NVC | 180 | | |
| | TOT CRDTS | 0 | 180 | | |
| 8/21/2011 | Bible Talks | | | NVC | |
| 6/6/2009 | Genesis | | | 3 | 99% A |
| 6/13/2009 | Matthew | | | 3 | 98% A |
| 6/20/2009 | Exodus | | | | A |
| 6/23/2009 | Mark | | | 3 | 99% A |
| 7/1/2009 | Leviticus | | | 3 | 99% A |
| 7/6/2009 | Luke | | | 3 | 98% A |
| 7/18/2009 | Numbers | | | 3 | 98% A |
| 7/18/2009 | John | | | 3 | 93% A |
| 7/21/2009 | Deuteronomy | | | 3 | 95% A |
| 7/29/2009 | Acts | | | 3 | 99% A |
| 7/29/2009 | CERTIFICATE- 1st Year | | | 30 | 98% A |
| 8/10/2009 | Joshua | | | 3 | 99% A |
| 8/10/2009 | Romans | | | 3 | 98% A |
| 8/15/2009 | Judges/Ruth | | | 30 | 100% A+ |
| 8/20/2009 | 1 Corinthians | | | 3 | 99% A |
| 8/26/2009 | 1&2 Samuel | | | 3 | 95% A |
| 9/4/2009 | 2 Corinthians | | | 3 | 99% A |
| 9/4/2009 | Galatians | | | 3 | 99% A |
| 9/8/2009 | 1 Kings/Chronicles | | | 3 | 100% A+ |
| 9/15/2009 | Ephesians | | | 3 | 99% A |
| 9/15/2009 | 2 Kings/Chronicles | | | 3 | 99% A |
| 9/29/2009 | CERTIFICATE- 2nd Year | | | 30 | |
| 10/4/2009 | Ezra/Nehem/Esther | | | 3 | 99% A |
| 10/13/2009 | Philippians | | | 3 | 99% A |
| 10/19/2009 | Job | | | 30 | |
| 10/26/2009 | Colossians/Philemon | | | 3 | 98% A |
| 11/5/2009 | Psalms | | | 3 | 93% A |
| 11/9/2009 | Eccles/Song&Lamentations | | | 3 | 98% A |
| 11/16/2009 | Proverbs | | | 3 | 99% A |
| 11/25/2009 | isaiah | | | 3 | 98% A |

| COURSE TITLE | DATE | HOURS | GRADE |
|---|---|---|---|
| Jeremiah | 12/14/2009 | 3 | 99% A |
| Eze | 12/8/2009 | 3 | 98% A |
| Daniel | 1/4/2010 | 3 | |
| CERTIFICATE- 3rd Year | 1/5/2010 | 30 | 98% A |
| Hosea/Joel/Amos | 1/12/2010 | 3 | 98% A |
| Obadiah/Jonah/Micah | 1/19/2010 | 3 | 99% A |
| Nahum/Habakkuk/Zeph | 1/19/2010 | 3 | 99% A |
| 1&2 Thessalonians | 2/5/2010 | 3 | 98% A |
| 1&2 Timothy/Titus | 2/9/2010 | 3 | 99% A |
| Hebrews | 2/18/2010 | 3 | 100% A+ |
| James | 2/25/2010 | 3 | 99% A |
| 1&2 Peter | 3/8/2010 | 3 | 99% A |
| Thesis | 3/8/2010 | | |
| CERTIFICATE- 4th Year | 2/25/2010 | 3 | 99% A |
| 1-3 John-Jude | 3/20/2010 | 3 | 99% A |
| Haggai/Zech/Malachi | 3/29/2010 | 3 | 99% A |
| Last Days-Mid East | 4/13/2010 | 6 | 99% A |
| OT Survey | 5/8/2010 | 6 | 99% A |
| NT Survey | 5/8/2010 | 6 | 93% A |
| Thesis 510- Doctrinal | 5/13/2010 | 6 | 95% A |
| Thesis 511- Biblical | 5/17/2010 | | |
| CERTIFICATE- 5th Year | 7/31/2010 | 30 | 100% A+ |
| Ind Research 610 | 7/31/2010 | 3 | 95% A |
| Ind Research 611 | 8/10/2010 | 3 | 98% A |
| Ind Research 612 | 8/27/2010 | 3 | 99% A |
| Revelation Revealed | 10/2/2010 | 6 | 98% A |
| Thesis | 8/31/2010 | | |
| CERTIFICATE- 6th Year | 10/15/2010 | 30 | |
| TOTAL CLASSROOM HRS | 10/15/2010 | 2700 | |

_(signature)_ Michael Johnson, PhD



DATE DRAFTED:
Keven Wyrick 08724-045
US Penitentiary, Marion
PO Box 1000
Marion, IL 62959

1/20/2011 ENROLLED:
PROGRAM:
PMI CRDTS
Trans Crdts
TOT-CRDTS

PMI CENTER FOR BIBLICAL STUDIES
POB 177 Battle Creek, MI 49016-0177
NOT OFFICIAL TRANSCRIPT WITHOUT SEAL
9/25/2010   PMI EVANG:
THEOLOGY (SCOFIELD)
LICENSED:
Tran Copies:
ORDAINED:

| DATE | COURSE TITLE | TOT-CRDTS | HOURS | DATE: DEGREE: GRADE | TR.C DATE | COURSE TITLE | HOURS | GRADE |
|---|---|---|---|---|---|---|---|---|
| 11/29/2010 Module 1 | Scofield Studies- 101 | 120 | 15 | 97% A | 1/14/2011 | 1/14/2011 Module 3 | 15 | 99% A |
| | Biographical Studies- 101 | 165 | | | | Scofield Studies- 301 | | |
| | Biblical Studies- 102 | 45 | | | | Biographical Studies- 302 | | |
| | Theme Studies- 103 | | | | | Biblical Studies- 303 | | |
| | Theology Proper Studies- 104 | | | | | Theme Studies- 304 | | |
| 12/28/2010 Collateral Rdg- Attack on Bible, Miss Facts | | | | | | Theology Proper Studies- 305 | | |
| 12/29/2010 Module 2 | Scofield Studies- 201 | | 30 | COMP 98% A | | SENT Module 4 | [15] | |
| | Biographical Studies- 202 | | COMP 15 | | | Scofield Studies- 401 | | |
| | Biblical Studies- 202 | | | | | Biographical Studies- 402 | | |
| | Theme Studies- 203 | | | | | Biblical Studies- 403 | | |
| | Theology Proper Studies- 204 | | | | | Theme Studies- 404 | | |
| | Theology Proper Studies- 205 | | | | | Theology Proper Studies- 405 | | |

1st YEAR

1/15/2011

2nd YEAR
[1/14/2011]
GRADUATION CERTIFICATE

GREAT JOB ONCE AGAIN BROTHER KEVEN.
G-H. LO. MY FRIEND DR. MIKE 2 TIM. 2:2



REGISTRAR APPROVED WITH SCHOOL SEAL HERE

PMI CENTER FOR BIBLICAL STUDIES
POB 177 Battle Creek, MI 49016-0177

NOT OFFICIAL TRANSCRIPT WITHOUT SEAL

PMI EVANG:

LICENSED: Tran Copies:

ORDAINED:

DATE DRAFTED:
Keven Wyrick 08724-045
US Penitenciary Marion
PO Box 1000
Marion, IL 62059

2/1/2012 ENROLLED:
12/10/2010

PROGRAM: THEOLOGY

DATE: 2/21/2012

PMI CRDTS 60
TRANSFER 150
TOT CRDTS 210

DEGREE: PhD

| DATE | COURSE TITLE | HOURS | GRADE | DATE | COLLATERAL READING | GRADE |
|------|--------------|-------|-------|------|--------------------|-------|
| 9/18/2011 | Module 1: Introduction - Bible | 15 | 99% A | 2/21/2012 | INTRO THE KING JAMES APOLOGETICS | PASS |
| 11/23/2011 | Module 2: God - Creation | 15 | 99% A | 12/21/2012 | MESSIANIC JUDAISM REFUTED | PASS |
| | 1st YEAR | | | | | |
| 1/15/2012 | Module 3: Sin - Salvation | 30 | | 12/21/2012 | SDA HERESIES | PASS |
| 2/1/2012 | Module 4: Church - Last Things | 15 | | 12/21/2012 | SABBATH WORSHIP REFUTED | PASS |
| | 2nd Year | 30 | 98% A | | | |

Case 4:94-cr-00194-GAF    Document 1133-1    Filed 12/19/23    Page 17 of 141



# Blackstone Career Institute

Established 1890

Confers this Diploma of

Legal Assistant/Paralegal

upon

## Keven Lee Wprick

who has fulfilled all the requirements prescribed by the School and is entitled
to all of the honors rights and privileges thereunto appertaining.

In Testimony Whereof this recognition of achievement is

Given this 4th day of March 2008

_____
President

_____
Director of ___: B.S., M.Ed.

# CERTIFICATE OF COMPLETION

## NON-RESIDENTIAL DRUG ABUSE PROGRAM

This certifies that

*Keven Wyrick*

Reg. No. 08724-045

has successfully completed the requirements for the
Non-Residential Drug Abuse Program

USP Marion, Illinois

February 7, 2017

D' Shaw, M.S
Drug Treatment Specialist

A. Figueredo, Psy.D
Drug Abuse Program Coordinator





# CENTURY COLLEGE

A MEMBER OF MINNESOTA STATE

AN AFFIRMATIVE ACTION EQUAL OPPORTUNITY
EMPLOYER & EDUCATOR

Continuing Education & Customized Training

# CONTINUING EDUCATION TRANSCRIPT

Keven Wyrick
USP-Marion
PO Box 2000
Marion, IL  62959

13595742

| Course ID | Name | End Date | Hours | CEUs |
|-----------|------|----------|-------|------|
| 20165-002777 | VT Information Processing | 3/14/2017 | 300 | 30 |

Authorized Signature: _____

4/3/2017

\* This educational program was taught by Federal Bureau of Prison Instructors.  Century College performs annual review and certification of this vocational program in compliance with American Correctional Association standards.

century.edu/continuing-education

# Certificate

THIS CERTIFIES THAT

_Kevin Wyrick_

has satisfactorily completed

_Basic Keyboarding Skills_

in

_Microcomputers Applications_

conducted by

## Louisiana Technical College
## Alexandria Campus

Given this _25th_ day of _May_, _2006_

_____
Campus Dean, Louisiana Technical College Campus

_____
Instructor



Certificate of Completion

DRUG EDUCATION PROGRAM

This certifies that

Keven Wyrick

has successfully completed the requirements for the Drug Education Program
on June 15, 2005, at the United States Penitentiary, Leavenworth, Kansas.

T. A. Majerus, M.A., Drug Treatment Specialist



Certificate of Completion

NON-RESIDENTIAL DRUG ABUSE
PROGRAM: PARENTING 101

This certifies that

Keven Wyrick

has successfully completed Non-Residential DAP Module: Parenting 101
on June 16, 2005, at the United States Penitentiary, Leavenworth, Kansas.

T. A. Magerus, Ph.D., Drug Treatment Specialist

Certificate of Completion

# NON-RESIDENTIAL DRUG ABUSE PROGRAM: PERSONAL CHANGE

This certifies that

## Kevin Wyrick

has successfully completed five hours of Non-Residential DAP: Personal Change on August 25, 2004, at the United States Penitentiary, Leavenworth, Kansas.

_(signature)_

T. A. Majerus, M.A., Drug Treatment Specialist

# Certificate of Training

## Certified Operator

This is to certify that

WYRICK

has successfully completed the

## Powered Industrial Trucks
## Training Program

AUGUST 1, 2005

Safety Department
1300 Metropolitan Ave.
Leavenworth, Kansas

_Earl Clayton Bey_
Instructor

_signature_
Safety Manager



Certificate of Completion

NON-RESIDENTIAL DRUG ABUSE
PROGRAM: ANGER MANAGEMENT

This certifies that

Keven Wyrick

has successfully completed Non-Residential DAP Module: Anger Management
on June 16, 2005, at the United States Penitentiary, Leavenworth, Kansas.

T. A. Mageris, M.A., Drug Treatment Specialist

# Certificate of Recognition

presented to:

## Keven Wyrick

Reg. No. 08724-045

successfully completed the

### Beyond Bars

### Release Preparation Class

United States Penitentiary
Marion, Illinois

September 22, 2016



K. Sanders, Case Manager

# Certificate
## of Achievement

Presented to

## Keven L. Wyrick

Who has successfully completed the required curriculum for Jambs in computer training in Microsoft Windows 2000 and the following Microsoft Office XP applications, using the MOS curriculum Word, Excel, and Power Point, to receive certification in

## Introduction to Business Computers

180 Hours

Presented on by:

_____
Course Instructor

_____
December 1, 2007
Date



# CERTIFICATE OF COMPLETION

is hereby presented to

Kevin Marek

to certify that he has completed
Legal Research
Constitutional Law
ADD-ON CONTINUING EDUCATION COURSE

USP Pollock, LA

November 12, 2005

S. Crawford, ACE Coordinator

Ron Martinez, Supervisor of Education



# CERTIFICATE OF COMPLETION

is hereby presented to

**Kevin Myrick**

to certify that he has completed

Legal Research

"Supreme Court Decisions"

ADULT CONTINUING EDUCATION COURSE

USP Beaumont, TX
November 24, 2005

S. Crawford, ACE Coordinator

Ron Martinez, Supervisor of Education



Certificate of completion

USP
Pollock, Louisiana

Keven Wyrick

Reg#: 08724-045

has successfully completed the requirements for the

"Stress-Less" Group

December 9, 2005

K. Francois, Counselor

D. Mott, Unit Manager

# Certificate of Completion

## A STUDY IN EXISTENTIALISM

This certifies that

### Keven Wyrick

has successfully completed Non-Residential DAP Module: Existentialism on August 18, 2005, at the United States Penitentiary, Leavenworth, Kansas.

T. A. Majeris, M.A., Drug Treatment Specialist

# OSHA

## 10-HOUR GENERAL INDUSTRY SAFETY & HEALTH
## OUTREACH TRAINING PROGRAM

PRESENTED TO

*Kevin L. Wynick*



SAFETY DEPARTMENT
P.O. Box 1000
Leavenworth, Kansas 66048
(913) 682-8700 Ext. 1166

rch 28 – April 1, 2005

RODUCTION TO OSHA
RSONAL PROTECTIVE EQUIPMENT
ZARD COMMUNICATION
LAMMABLE AND COMBUSTIBLE LIQUIDS

MEANS OF EGRESS AND FIRE PROTECTION
ELECTRICAL AND LOCKOUT/TAGOUT
WALKING AND WORKING SURFACES
MACHINE GUARDING

OSHA Outreach Trainer

# Certificate of Participation

## USP Marion
## Recreation Department

### THIS IS TO CERTIFY THAT

## A. White

### Has Completed All Required Course Work
### For The Piano Class

Dec 22nd, 2013

M.W. West Sports Specialist

# CERTIFICATE OF COMPLETION

## THIS CERTIFIES THAT

# KEVIN WYRICK

HAS SUCCESSFULLY COMPLETED 500 MILES IN THE WALK/JOG CLASS CONDUCTED AT

# U.S.P. MARION, IL

GIVEN THIS 22ND DAY OF JUNE 2014

_____
K. MILES, SPORTS SPECIALIST



# CERTIFICATE OF
# COMPLETION

THIS CERTIFIES THAT

## KEVEN WYRICK

HAS SUCCESSFULLY COMPLETED 1,000 MILES
IN THE COURSE MATERIAL WITH WALK/JOG CLASS AND ALL REQUIRED.

## U.S.P. MARION, ILL

GIVEN THIS 28 DAY OF JUNE 2012

WELLNESS SPORTS SPECIALIST

# CERTIFICATE OF COMPLETION

THIS CERTIFIES THAT

## KEVIN WYRICK

HAS SUCCESSFULLY COMPLETED 1000 MILES AND ALL REQUIRED
COURSE MATERIAL IN THE WALK/JOG CLASS CONDUCTED AT

## U.S.P. MARION, IL

GIVEN THIS _____ 18TH _____ DAY OF _____ AUGUST 2014 _____

K. MILES, SPORTS SPECIALIST



Certificate of Completion

This certificate is hereby Awarded to

Keven Wyrick

For Completing the Following Ace I Class

Paralegal Careers



# Certificate of Completion

This Certificate is Hereby Awarded To

## Keven Wyrick

For Completing the Following At This Class

### Legal Research 1



Certificate of Completion

This certificate is hereby awarded to

Keven Wyrick

For completing the following ABA class

Legal Writing



# Certificate of Completion

This Certificate is hereby Awarded To

**Steven Wyrick**

for Completing the A.C.E. Class

*Small Business Development*



Certificate of Completion

This Certificate is Hereby Awarded to

Steven Wyrick

For Completing the ACI Class

Electrical Theory

Class Start Date: March 2015

Session: One





**Certificate of Completion**

This Certificate is Hereby Awarded to

*Keven Wyrick*

For Completing the I.C.E. Class

*Home Plumbing*

# CERTIFICATE OF COMPLETION

THIS CERTIFIES THAT

## KEVEN WYRICK

HAS SUCCESSFULLY COMPLETED ALL REQUIRED COURSE
MATERIAL FOR THE RUNNING GROUP CONDUCTED AT

## U.S.P. MARION, IL

GIVEN THIS 8TH DAY OF OCTOBER 2015

K. MILES, SPORTS SPECIALIST

# Certificate of Completion

for successful completion of U.S.P. Marion's

## Beginner's Fitness Class

awarded to:

Keven Wyrick

1/20/2016 – 3/16/2016

Certified by:   V. Fields, Recreation Specialist



Certificate of Completion

This certificate is awarded to

Keven Wyrick

In recognition for completion of:

Personal Finance 1

Granted: March 21, 2016

T. Castellano    Supervisor of Education

TAMMY CASTELLANO

K. Kirkpatrick Teacher



Certificate of Completion

This certificate is awarded to

Keven Wyrick

In recognition for completion of:

Legal research 1

Granted: March 21, 2016

T. Castellano
TAMMY CASTELLANO
Supervisor of Education

K. Kirkpatrick Teacher



# Certificate of Completion

This certificate is awarded to

## Keven Wyrick

In recognition for completion of

### Spanish 2

Granted: March 21, 2016

T. Castellano   Supervisor of Education

TAMMY CASTELLANO

K. Kirkpatrick Teacher

# A.C.E.

## Certificate of Completion

For the completion of the Adult Continuing Education Course of

### Kevin Wyrick

is hereby awarded to

## Typing 1

Granted May 27, 2016

_____
Teacher/Speaker
TAMMY CASTELLANO
Castellano Education Supervisor



A.C.E.

Certificate of completion

Is hereby granted to

Keven Wyrick

for the completion of the Adult Continuing Education Course of

Typing 2

Granted: November 3, 2016

TAMMY CASTELLANO
I. Castellano Education Supervisor



# A.C.E.

# Certificate of Completion

Is hereby granted to:

**Keven Wynek**

For his completion of the Adult Continuing Education Course of:

**Typing 3**

Granted November 2, 2016

TAMMY CASTELLANO
T. Castellano, Education Supervisor



*Certificate of Completion*

This certificate is awarded to

**Keven Wyrick**

In recognition for completion of

**Anthropology/American History**

Granted: November 10, 2016

TAMMY CASTELLANO

T. Castellano - Supervisor of Education

K. Kimbriel - Teacher



Certificate of Completion

This certificate is awarded to

Keven Wyrick

In recognition for completion of

United States History/Wars

Granted: November 20, 2016

TAMMY CASTELLANO
Director, Casa de Esperanza

# MANUFACTURING SKILL STANDARDS COUNCIL

*HAS CONFERRED UPON*

## THE CERTIFIED PRODUCTION TECHNICIAN₄ℇ CERTIFICATION

### KEVEN WYRICK

For the successful completion of all four CPT production technician assessments in the areas of:
SAFETY, QUALITY PRACTICE & MEASUREMENT, MANUFACTURING PROCESSES
AND PRODUCTION, MAINTENANCE AWARENESS.

GIVEN ON THIS 19TH DAY OF SEPTEMBER IN THE YEAR 2017



CHIEF EXECUTIVE OFFICER
Candidate ID:80764
Expiration Date: 9/19/2022
Certification Date: 9/19/2017

**M. Skills Certification System**

the real ethic of the eye of Maturation power for the portals
the relegory right the tenant of the tenant the relegory tenant

Certification can be verified at verify.msscusa.org



*This award presented to:*

# Certificate
## of
## Completion

*In recognition of completing*

# Keven Wyrick

## ADVANCED
## CAREER SEARCH

Completion Date: 3/15/2017

_____
Reentry Affairs Coordinator

3-15-17
_____
Date

CENTURY
COLLEGE

# Certificate of Completion

Has Successfully Completed 300 Contact Hours and 30  Continuing Education Units

awarded to

## Keven Wyrick

for

### VT Information Processing

In acknowledgement thereof these signatures are affixed on this day,

Tuesday, March 14, 2017



Interim Dean, Continuing Education & Customized Training

*This educational program was taught by Federal Bureau of Prison Instructors. Century College performs annual review and certification of this vocational program in compliance with American Correctional Association standards.

Century College is an equal opportunity, affirmative action employer and educator, and a member of the Minnesota State Colleges and Universities system.



# STUDENT OF THE YEAR

### THIS CERTIFICATE IS AWARDED TO:

*Keven Wyrick 08-24-015*

In recognition for his outstanding accomplishments as Microsoft Office Student.





# CERTIFIED PRODUCTION TECHNICIAN

## CRITICAL PRODUCTION FUNCTIONS COVERED BY MSSC COURSES AND ASSESSMENTS:

The Manufacturing Skill Standards Council (MSSC) credentialing system leading to a CPT covers the four critical production functions, as defined by MSSC's industry-led, nationally-validated skills standards, common to all sectors of manufacturing: Safety, Quality & Continuous Improvement, Manufacturing Processes & Production, and Maintenance Awareness. Each area is addressed with a separate assessment. MSSC training and assessments are organized around those four modules. An individual can earn a "Certificate" if they pass one or more assessments. However, they must pass all four assessments to earn the full "CPT" certification. MSSC strongly recommends that individuals be at the 9th grade level of math and 10th grade level of English before attempting MSSC courses and assessments. The four critical functions and their related key activities are described below:

### SAFETY

1. Work in a Safe and Productive Manufacturing Workplace.
2. Perform safety and environmental inspections
3. Perform emergency drills and participate in emergency teams
4. Identify unsafe conditions and take corrective action
5. Provide safety orientation for all employees
6. Train personnel to use equipment safely
7. Suggest processes and procedures that support safety of work environment
8. Fulfill safety and health requirements for maintenance, installation, and repair
9. Monitor safe equipment and operator performance
10. Utilize effective, safety-enhancing workplace practices

### MANUFACTURING PROCESSES & PRODUCTION

1. Identify customer needs
2. Determine resources available for the production process
3. Set up equipment for the production process
4. Set team production goals
5. Make job assignments
6. Coordinate work flow with team members and other work groups
7. Communicate production and material requirements and product specifications
8. Perform and monitor the process to make the product
9. Document product and process compliance with customer requirements
10. Prepare final product for shipping or distribution

### QUALITY PRACTICES & MEASUREMENT

1. Participate in periodic internal quality audit activities.
2. Check calibration of gages and other data collection equipment
3. Suggest continuous improvements
4. Inspect materials and product/process at all stages to ensure they meet specifications
5. Document the results of quality tests
6. Communicate quality problems.
7. Take corrective actions to restore or maintain quality
8. Record process outcomes and trends
9. Identify fundamentals of blueprint reading.
10. Use common measurement systems and precision measurement tools

### MAINTENANCE AWARENESS

1. Perform preventive maintenance and routine repair
2. Monitor indicators to ensure correct operations
3. Perform all housekeeping to maintain production schedule
4. Recognize potential maintenance issues with basic production systems including knowledge of when to inform maintenance personnel about problems with:
   - Electrical systems
   - Pneumatic systems
   - Hydraulic systems
   - Machine automation systems
   - Lubrication processes
   - Bearings and couplings
   - Belts and chain drives

NOTE: MSSC assesses core understanding of the key work activities and core technical knowledge and skills needed in high-performance manufacturing, as defined by MSSC Production Skill Standards. Given online, MSSC Assessments also help measure basic computer, problem-solving and analytical skills and one's ability to apply knowledge to specific situations identified in the assessments. There are no experiential or hands-on requirements for MSSC certification as it is expected that individual employers will determine those requirements based upon their own specific needs. MSSC does not require that individuals take MSSC courses prior to testing.




# CERTIFIED PRODUCTION TECHNICIAN

## CRITICAL PRODUCTION FUNCTIONS COVERED BY MSSC COURSES AND ASSESSMENTS:

The Manufacturing Skill Standards Council (MSSC) credentialing system leading to a CPT covers the four critical production functions, as defined by MSSC's industry-led, nationally validated skills standards, common to all sectors of manufacturing: Safety, Quality & Continuous Improvement, Manufacturing Processes & Production, and Maintenance Awareness. Each area is addressed with a separate assessment. MSSC training and assessments are organized around those four modules. An individual can earn a "Certificate" if they pass one or more assessments. However, they must pass all four assessments to earn the full "CPT" certification. MSSC strongly recommends that individuals be at the 9th grade level of math and 10th grade level of English before attempting MSSC courses and assessments. The four critical functions and their related key activities are described below:

### SAFETY

1. Work in a Safe and Productive Manufacturing Workplace
2. Perform safety and environmental inspections
3. Perform emergency drills and participate in emergency teams
4. Identify unsafe conditions and take corrective action
5. Provide safety orientation for all employees
6. Train personnel to use equipment safely
7. Suggest processes and procedures that support safety of work environment
8. Fulfill safety and health requirements for maintenance, installation, and repair
9. Monitor safe equipment and operator performance
10. Utilize effective, safety-enhancing workplace practices

### MANUFACTURING PROCESSES & PRODUCTION

1. Identify customer needs
2. Determine resources available for the production process
3. Set up equipment for the production process
4. Set team production goals
5. Make job assignments
6. Coordinate work flow with team members and other work groups
7. Communicate production and material requirements and product specifications
8. Perform and monitor the process to make the product
9. Document product and process compliance with customer requirements
10. Prepare final product for shipping or distribution

### QUALITY PRACTICES & MEASUREMENT

1. Participate in periodic internal quality audit activities
2. Check calibration of gages and other data collection equipment
3. Suggest continuous improvements
4. Inspect materials and product/process at all stages to ensure they meet specifications
5. Document the results of quality tests
6. Communicate quality problems
7. Take corrective actions to restore or maintain quality
8. Record process outcomes and trends
9. Identify fundamentals of blueprint reading
10. Use common measurement systems and precision measurement tools

### MAINTENANCE AWARENESS

1. Perform preventive maintenance and routine repair
2. Monitor indicators to ensure correct operations
3. Perform all housekeeping to maintain production schedule
4. Recognize potential maintenance issues with basic production systems including knowledge of when to inform maintenance personnel about problems with:
   - Electrical systems
   - Pneumatic systems
   - Hydraulic systems
   - Machine automation systems
   - Lubrication processes
   - Bearings and couplings
   - Belts and chain drives

**NOTE:** MSSC assesses core understanding of the key work activities and core technical knowledge and skills needed in high-performance manufacturing, as defined by MSSC Production Skill Standards. Given, online, MSSC Assessments also help measure basic computer, problem-solving, and analytical skills and one's ability to apply knowledge to specific situations identified in the assessments. There are, no experiential or hands-on requirements for MSSC certification as it is expected that individual employers will determine those requirements based upon their own specific needs. MSSC does not require that individuals take MSSC courses prior to testing.

# MANUFACTURING SKILL STANDARDS COUNCIL

*HAS CONFERRED UPON*

## KEVEN WYRICK

### THE CERTIFIED PRODUCTION TECHNICIAN PROCESS & PRODUCTION CERTIFICATE

*GIVEN ON THIS 11TH DAY OF JULY IN THE YEAR 2017*



THE NATIONAL ASSOCIATION OF MANUFACTURERS ENDORSED
Skills Certification System

CHIEF EXECUTIVE OFFICER
Candidate ID: 80764



# CERTIFIED PRODUCTION TECHNICIAN

## CRITICAL PRODUCTION FUNCTIONS COVERED BY MSSC COURSES AND ASSESSMENTS

The Manufacturing Skill Standards Council (MSSC) credentialing system leading to a CPT covers the four critical production functions, as defined by MSSC's industry-led, nationally validated skill standards, common to all sectors of manufacturing: Safety, Quality & Continuous Improvement, Manufacturing Processes & Production, and Maintenance Awareness. Each area is addressed with a separate assessment. MSSC training and assessments are organized around these four modules. An individual can earn a "Certificate" if they pass one or more assessments. However, they must pass all four assessments to earn the full "CPT" certification. MSSC strongly recommends that individuals be at the 9th grade level of math and 10th grade level of English before attempting MSSC courses and assessments. The four critical functions and their related key activities are described below:

### SAFETY

1. Work in a Safe and Productive Manufacturing Workplace
2. Perform safety and environmental inspections
3. Perform emergency drills and participate in emergency teams
4. Identify unsafe conditions and take corrective action
5. Provide safety orientation for all employees
6. Train personnel to use equipment safely
7. Suggest processes and procedures that support safety of work environment
8. Fulfill safety and health requirements for maintenance, installation, and repair
9. Monitor safe equipment and operator performance
10. Utilize effective, safety-enhancing workplace practices

### MANUFACTURING PROCESSES & PRODUCTION

1. Identify customer needs
2. Determine resources available for the production process
3. Set up equipment for the production process
4. Set team production goals
5. Make job assignments
6. Coordinate work flow with team members and other work groups
7. Communicate production and material requirements and product specifications
8. Perform and monitor the process to make the product
9. Document production and process compliance with customer requirements
10. Prepare final product for shipping or distribution

### QUALITY PRACTICES & MEASUREMENT

1. Participate in periodic internal quality audit activities
2. Check calibration of gages and other data collection equipment
3. Suggest continuous improvements
4. Inspect materials and product/process at all stages to ensure they meet specifications
5. Document the results of quality tests
6. Communicate quality problems
7. Take corrective actions to restore or maintain quality
8. Record process outcomes and trends
9. Identify fundamentals of blueprint reading
10. Use common measurement systems and precision measurement tools

### MAINTENANCE AWARENESS

1. Perform preventive maintenance and routine repair
2. Monitor indicators to ensure correct operations
3. Perform all housekeeping to maintain production schedule
4. Recognize potential maintenance issues with basic production equipment, including knowledge of when to inform maintenance personnel about problems with:
   - Electrical systems
   - Pneumatic systems
   - Hydraulic systems
   - Machine automation systems
   - Lubrication processes
   - Bearings and couplings
   - Belts and chain drives

NOTE: MSSC assesses core understanding of the key work activities and core technical knowledge and skills needed in high-performance manufacturing, as defined by MSSC Production Skill Standards. Given online, MSSC Assessments also help measure basic computer, problem-solving and analytical skills and one's ability to apply knowledge to specific situations identified in the assessments. There are no experiential or hands-on requirements for MSSC certification as it is expected that individual/employers will determine those requirements based upon their own specific needs. MSSC does not require that individuals take MSSC courses prior to testing.




# MANUFACTURING SKILL STANDARDS COUNCIL

*HAS CONFERRED UPON*

## KEVEN WYRICK

### THE CERTIFIED PRODUCTION TECHNICIAN QUALITY PRACTICES & MEASUREMENT CERTIFICATE

GIVEN ON THIS 30TH DAY OF MAY IN THE YEAR 2017



CPT

The National Association of Manufacturers' Endorsed
Skills Certification System
*Powered by the Manufacturing Institute*

CHIEF EXECUTIVE OFFICER
Candidate ID: 80764



# CERTIFIED PRODUCTION TECHNICIAN

## CRITICAL PRODUCTION FUNCTIONS COVERED BY MSSC COURSES AND ASSESSMENTS:

The Manufacturing Skill Standards Council (MSSC) credentialing system leading to a CPT covers the four critical production functions, as defined by MSSC's industry-led, nationally validated skills standards, common to all sectors of manufacturing: Safety, Quality & Continuous Improvement, Manufacturing Processes & Production, and Maintenance Awareness. Each area is addressed with a separate assessment. MSSC training and assessments are organized around those four modules. An individual can earn a "Certificate" if they pass one or more. However, they must pass all four assessments to earn the full "CPT certification. The four critical functions and their related key activities are described below:



### SAFETY

1. Work in a Safe and Productive Manufacturing Workplace
2. Perform safety and environmental inspections
3. Perform emergency drills and participate in emergency teams
4. Identify unsafe conditions and take corrective action
5. Provide safety orientation for all employees
6. Train personnel to use equipment safely
7. Suggest processes and procedures that support safety of work environment
8. Fulfill safety and health requirements for maintenance, installation, and repair
9. Monitor safe equipment and operator performance
10. Utilize effective, safety-enhancing workplace practices

### MANUFACTURING PROCESSES & PRODUCTION

1. Identify customer needs
2. Determine resources available for the production process
3. Set up equipment for the production process
4. Set team production goals
5. Make job assignments
6. Coordinate work flow with team members and other work groups
7. Communicate production and material requirements and product specifications
8. Perform and monitor the process to make the product
9. Document product and process compliance with customer requirements
10. Prepare final product for shipping or distribution

### QUALITY PRACTICES & MEASUREMENT

1. Participate in periodic internal quality audit activities
2. Check calibration of gages and other data collection equipment
3. Suggest continuous improvements
4. Inspect materials and product/process at all stages to ensure they meet specifications
5. Document the results of quality tests
6. Communicate quality problems
7. Take corrective actions to restore or maintain quality
8. Record process outcomes and trends
9. Identify fundamentals of blueprint reading
10. Use common measurement systems and precision measurement tools

### MAINTENANCE AWARENESS

1. Perform preventive maintenance and routine repair
2. Monitor indicators to ensure correct operations
3. Perform all housekeeping to maintain production schedule
4. Recognize potential maintenance issues with basic production systems, including knowledge of when to inform maintenance personnel about problems with:
   - Electrical systems
   - Pneumatic systems
   - Hydraulic systems
   - Machine automation systems
   - Lubrication processes
   - Bearings and couplings
   - Belts and chain drives

NOTE: MSSC assesses core understanding of the key work activities and core technical knowledge and skills needed in high-performance manufacturing, as defined by MSSC's Production Skill Standards. Given online, MSSC Assessments also help measure basic computer, problem-solving and analytical skills, and one's ability to apply knowledge to specific situations identified in the assessments. There are no experiential or hands-on requirements for MSSC certification as it is expected that individual employers will determine those requirements based upon their own specific needs. MSSC does not require that individuals take MSSC courses prior to testing.

# MANUFACTURING SKILL STANDARDS COUNCIL

*HAS CONFERRED UPON*

## KEVEN WYRICK

# THE CERTIFIED PRODUCTION TECHNICIAN SAFETY CERTIFICATE

GIVEN ON THIS 18TH DAY OF APRIL IN THE YEAR 2017



**CPT**
AE

Skills Certification System

THE NATIONAL ASSOCIATION OF MANUFACTURERS' CENTER OF
Product of a non-profit 501c(3) Learning Institute

CHIEF EXECUTIVE OFFICER
Candidate ID: 80764



# CERTIFIED PRODUCTION TECHNICIAN

## CRITICAL PRODUCTION FUNCTIONS COVERED BY MSSC COURSES AND ASSESSMENTS:

The Manufacturing Skill Standards Council (MSSC) credentialing system leading to a CPT covers the four critical production functions, as defined by MSSC's industry-led, nationally validated skills standards, common to all sectors of manufacturing: Safety, Quality & Continuous Improvement, Manufacturing Processes & Production, and Maintenance Awareness. Each area is addressed with a separate assessment. MSSC training and assessments are organized around those four modules. An individual can earn a "Certificate" if they pass one or more assessments, however, they must pass all four assessments to earn the full "CPT" certification. MSSC strongly recommends that individuals be at the 9th grade level of math and 10th grade level of English before attempting MSSC courses and assessments. The four critical functions and their related key activities are described below:

### SAFETY
1. Work in a Safe and Productive Manufacturing Workplace.
2. Perform safety and environmental inspections.
3. Perform emergency drills and participate in emergency teams.
4. Identify unsafe conditions and take corrective action.
5. Provide safety orientation for all employees.
6. Train personnel to use equipment safely.
7. Suggest processes and procedures that support safety of work environment.
8. Fulfill safety and health requirements for maintenance, installation, and repair.
9. Monitor safe equipment and operator performance.
10. Utilize effective, safety-enhancing workplace practices.

### MANUFACTURING PROCESSES & PRODUCTION
1. Identify customer needs.
2. Determine resources available for the production process.
3. Set up equipment for the production process.
4. Set team production goals.
5. Make job assignments.
6. Coordinate work flow with team members and other work groups.
7. Communicate production and material requirements and product specifications.
8. Perform and monitor the process to make the product.
9. Document product and process compliance with customer requirements.
10. Prepare final product for shipping or distribution.

### QUALITY PRACTICES & MEASUREMENT
1. Participate in periodic internal quality audit activities.
2. Check calibration of gages and other data collection equipment.
3. Suggest continuous improvements.
4. Inspect materials and product/process at all stages to ensure they meet specifications.
5. Document the results of quality tests.
6. Communicate quality problems.
7. Take corrective actions to restore or maintain quality.
8. Record process outcomes and trends.
9. Identify fundamentals of blueprint reading.
10. Use common measurement systems and precision measurement tools.

### MAINTENANCE AWARENESS
1. Perform preventive maintenance and routine repair.
2. Monitor indicators to ensure correct operations.
3. Perform all housekeeping to maintain production schedule.
4. Recognize potential maintenance issues with basic production systems, including knowledge of when to inform maintenance personnel about problems with:
   - Electrical systems
   - Pneumatic systems
   - Hydraulic systems
   - Machine automation systems
   - Lubrication processes
   - Bearings and couplings
   - Belts and chain drives

NOTE: MSSC assesses core understanding of the key work activities and core technical knowledge and skills needed in high-performance manufacturing as defined by MSSC Production Skill Standards. Given online, MSSC Assessments also help measure basic computer, problem-solving and analytical skills and one's ability to apply knowledge to specific situations identified in the assessments. There are no experiential or hands-on requirements for MSSC certification as it is expected that individual employers will determine those requirements based upon their own specific needs. MSSC does not require that individuals take MSSC courses prior to testing.



# MANUFACTURING SKILL STANDARDS COUNCIL

*HAS CONFERRED UPON*

## KEVEN WYRICK

# THE CERTIFIED PRODUCTION TECHNICIAN MAINTENANCE AWARENESS CERTIFICATE

GIVEN ON THIS 19TH DAY OF SEPTEMBER IN THE YEAR 2017

Skills Certification System

CPT®

CHIEF EXECUTIVE OFFICER
Candidate ID: 80764



# CERTIFICATION OF APPRECIATION

THIS CERTIFICATE IS AWARDED TO

Keven Wyrick

IN RECOGNITION OF VOLUNTEERING YOUR SERVICE TO THE

## REENTRY SIMULATION

SEPTEMBER 14, 2017

DATE OF COMPLETION

M. Sheffer

Reentry Affairs Coordinator

# Certificate of Achievement

This certifies that

*Kevin Wyrick*

has completed a 10-week, 20-hour Adult Continuing Education course in American Sign Language.

Ms. Jackson
Ms. Jackson, Coordinator

Adult Continued Education (ACE) Program
Education Department
United States Penitentiary Leavenworth, KS

09-06-2019
Date

# CERTIFICATE OF COMPLETION

## USP LEAVENWORTH EDUCATION DEPARTMENT

This certifies that

## Keven Wyrick

Has satisfactorily completed 10 total participation hours
On this 5th day of August, 2019 in

## Tutor Training

T. Gardner, Teacher

# CERTIFICATE OF COMPLETION

## THIS IS TO CERTIFY THAT

KEVIN WYRICK 08724-045

HAS SUCCESSFULLY COMPLETED ALL REQUIREMENTS FOR
USP LEAVENWORTH RECREATION DEPARTMENTS

ADVANCED YOGA CLASS



M. ABRON

# CERTIFICATE OF COMPLETION

## THIS IS TO CERTIFY THAT

**KEVIN WYRICK 08724-045**

HAS SUCCESSFULLY COMPLETED ALL REQUIREMENTS FOR
USP LEAVENWORTH RECREATION DEPARTMENTS

YOGA BEGINNERS



# Certificate of Achievement

This certifies that

*Steven Wyrick*

has completed a 10-week, 10-hour Adult Continuing Education course in American Sign Language 2.

**Ms. Jackson**

Ms. Jackson, Coordinator

Adult Continued Education (ACE) Program
Education Department
United States Penitentiary Leavenworth, KS

**12-20-2019**

Date

# CERTIFICATE
# of ACHIEVEMENT

THIS ACKNOWLEDGES THAT

# Keven Wyrick

HAS SUCCESSFULLY COMPLETED THE

Debate Class

January 23, 2020

B. Dean-Felton, Teacher



# CERTIFICATE of COMPLETION

THIS ACKNOWLEDGES THAT

## Kevin Wyrick

HAS SUCCESSFULLY COMPLETED THE

Canterbury Tales Class

JANUARY 31
2020

SIGNED, B. Dean-Felton, Teacher

EXHIBIT D

| Register Number: | 08724-045 | | Date: | 2/9/2021 | |
|---|---|---|---|---|---|
| Inmate Name: | Wyrick, Keven L. | | | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| 1. Current Age | > 60 | 0 | | 0 | |
| 51-60 | 51-60 | 7 | | 4 | |
| Click on gray dropdown box to select, then click on dropdown arrow | 41-50 | 14 | 7 | 8 | 4 |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| 2. Walsh w/Conviction | No | 0 | | 0 | |
| No | Yes | 1 | 0 | 0 | 0 |
| 3. Violent Offense (PATTERN) | No | 0 | | 0 | |
| No | Yes | 5 | 0 | 5 | 0 |
| 4. Criminal History Points | 0 - 1 Points | 0 | | 0 | |
| 4 - 6 Points | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | 16 | 8 | 8 |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| 5. History of Escapes | None | 0 | | 0 | |
| None | > 10 Years Minor | 2 | 0 | 1 | 0 |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| 6. History of Violence | None | 0 | | 0 | |
| None | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | 0 | 3 | 0 |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| 7. Education Score | Not Enrolled | 0 | | 0 | |
| HS Degree / GED | Enrolled in GED | -2 | -4 | -1 | -2 |
| | HS Degree / GED | -4 | | -2 | |
| 8. Drug Program Status | No DAP Completed | 0 | | 0 | |
| No Need | NRDAP Complete | -3 | -9 | -1 | -3 |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| 9. All Incident Reports   (120 months) | 0 | 0 | | 0 | |
| 0 | 1 | 1 | 0 | 1 | 0 |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| 10. Serious Incident Reports  (120 months) | 0 | 0 | | 0 | |
| 0 | 1 | 2 | 0 | 2 | 0 |
| | 2 | 4 | | 4 | |
| | > 2 | 6 | | 6 | |
| 11. Time Since Last Incident Report | 12+ months or no incidents | 0 | | 0 | |
| 12+ months or no incidents | 7-12 months | 2 | 0 | 1 | 0 |
| | 3-6 months | 4 | | 2 | |
| | <3 | 6 | | 3 | |
| 12. Time Since Last Serious Incident Report | 12+ months or no incidents | 0 | | 0 | |
| 12+ months or no incidents | 7-12 months | 1 | 0 | 1 | 0 |
| | 3-6 months | 2 | | 2 | |
| | <3 | 3 | | 3 | |
| 13. FRP Refuse | NO | 0 | | 0 | |
| NO | YES | 1 | 0 | 1 | 0 |
| 14. Programs Completed | 0 | 0 | | 0 | |
| > 10 | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | -8 | -2 | -4 |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| 15. Work Programs | 0 Programs | 0 | | 0 | |
| >1 Program | 1 Program | -1 | -2 | -1 | -2 |
| | >1 Program | -2 | | -2 | |
| Total Score (Sum of Columns) | | General: | 0 | Violent: | 1 |
| General/Violent Risk Levels | | General: | Minimum | Violent: | Minimum |
| OVERALL MALE PATTERN RISK LEVEL | | | | | Minimum |

**EXHIBIT E**

Dear Honorable Judge,

I, Justin Wyrick, am writing to ask you to consider clemency towards my father, Keven Wyrick. I won't bore you with appeals to innocence or theorize how long someone should serve for a murder charge. While I hadn't been born yet, I feel confident when I say my father is not the man he once was.

Rehabilitation obviously can't be predicted with certainty but I believe my father has had the change of mind and attitude in addition to the family support necessary to live in a civilized society again. During his sentence thus far, he has shown a great track record of behavior and has been a spiritual comrade to many in his faith based progress. My father has gotten his paralegal degree and 3 other degrees showing his desire to seek out new streams of thought and knowledge. He even assisted my Sociology studies when looking at the impact of religion on American and Middle Eastern culture. Considering all this and his continued progress through the Life Connections program, I believe my father deserves a second chance. I fully admit my bias, but I hope you think he deserves a second chance too.

Yours Truly,

Dear Honorable Judge,

My name is Theresa Gray. And I am writing this letter to let you know that my Brother Keven Wyrick has the support of his family.

Keven is extremly Remorsful of his actions in his younger years. He has been very active in his rehabilitaion. He has gotten numerous Certifications and Degrees in his 25 years he has been incarcerated.

Keven is currently enrolled in a class (program) that is to prepare him for integraion in to the world outside of the prison walls. I am sure he will do well. He has been a model prisioner for the whole time he has been in prison.

As I told you in the beginning of this letter, we support him fully. He has a choice of places to live after his release. My house in Garden City Missouri and my fathers in Harrisonville Missouri.

Thank you for your Consideraton in this matter.

Thank you
Theresa Gray

Honorable Judge

My name is Tina Wyrick
Sister to Keven Wyrick.

My Brother Keven Wyrick
has accomplished so much in the
Past 25 years while Being incarcerated
many diploma's in theology and a
Certificate in Paralegal.

He Has always had an amazing
work ethic Working no matter
what the pay and only missing 2-3
days in the past 25 years while
incarcerated.

What has impressed me
and Brought Joy to my Heart,
Was the moment he accepted The
Lord Jesus Christ as his personal
Savior. He began over 20 years
ago afterwards Reading the
Bible, studying and what he
applying what he learned to his

Everyday Life. I Remember thinking if this is real only time would tell. I had visited my brother in prison and when talking with him in person and on the phone.

I knew it was, By how he talked with all always Respectful, Humble and Gratefull for the littlest thing. Even all that was not what convineed me that he was a changed man with a heart for God.

When talking with him, he has always expressed to me how sorry he was for all the Pain he has caused and on several occasions became emotiona as we were talking over the regrets and the Fact nothing can take Back what he has done. he has such remorse and with that I knew he was a changed man and deserves a Second Chance in Society

Sincerely
Tina Wynich

Honorable Judge

I Am Keven Wprick's father writing this in his behalf.

If there is one man in the Prison system that has been rehabilitated he is the one that has.

Keven has been in prison for 26 years and in all that time he has educated himself to having a Doctor Degree in Philosophy in Theology and has taken all the classes offered by the prison system.

Since Keven has been in prison he has had a good clear conduct and work ethic beyond reproach. As well as ~~had~~ having a good Report

with the Prison offical.

Keven is most remorseful for
all the things he has done when
he was younger.

If by your decision he is
released he has a place to live
and a way to get to the places
he needs to go even when
he gets a job.

Since I have worked for Honeywell
for 33 years and Security for the
Federal Court House in downtown
Kansas City for 18 years I have
Never asked for Anything from the
Court System but now that I
am 85 years old and not much left

I would like some leniency
for my son so I could spend
some time with him befor I
Pass on.


Respectfully

Jury Wyrick
Father

I met Keven Wyrick in 1997 and he was finding his way through life in a difficult situation called prison. After years of being around him daily and I started seeing a change in him, he had because a Christian and built a relationships with the Creator. At first I just thought it was something dude's in prison do because I've seen it many time's but his change and love for the Creator was real not by his word's but by his actions!... Me and Keven got closer and closer because we both was basically in the same situation we both had a life sentence at that time. And he never wavered from his belief and his actions of becoming a better man never changed either. So I said that to say this, day's change, month's change, years change, time's change and people change to and that's always good if the change is for the better. Keven Wyrick has changed to become a good and better man and though we can't erase our past we can change our future. So Keven deserve a chance to change his future and show is family and society the man he has become... Everyone has made some bad decisions in life and everyone deserves a chance to be better if they do better. So, from being around Keven Wyrick for many years daily an becoming his friend and seeing the man he has become he deserves another chance! to....

May peace be with you

Sincerely yours
Mr. Quary
Jamet Quary

Sunday May 9th, 2021

To Whom it may concern,

My name is Colter Ketter and I am currently incarcerated at the U.S. Penitentiary in Leavenworth, Kansas and have been so since May of 2019. In this time I have come to know Mr. Wyrick as a caring and compassionate individual whose spiritual goodness radiates throughout our entire prison community. Mr. Wyrick's generosity toward anyone in need of help is unsurpassed. He is kind-hearted and willing to give any amount of his own time to assist someone that may be spiritually struggling with their beliefs, Christian or otherwise. I am proud to call Mr. Wyrick a great spiritual mentor, role model and most important of all, a great friend.

Thank You,

Colter Ketter
30349-047

To Whom it May concern,

God bless you.
I am writing this letter for Keven
Wyrick. I have known Keven for 2½
years. He has been a great mentor, and
friend. He has taught me much about
our Lord Jesus Christ. He has great
knowledge, and shares freely with
anyone who will listen.

Keven is a true mentor. He has
encouraged me to continue in my studies
about the Bible, and to join the Life
Connections Program. I have witnessed
him, telling others not to return to the
criminal life, but instead to seek lawful
employment. He tells his story as a
compelling reason to go straight. He really
loves, and misses, his family.

If there is anyone who I have met
since my incarceration who has truly
changed for the better, and deserves a
chance to return to their community, it
is Keven Wyrick. Thank you.

Sincerely,

Ron Myers
Ronald Myers
# 20046-013

To whom it may concern                    5/9/21

     My name is Billy Emery #32037-171
I met Keven Wyrick About 2 years Ago
we Both came To B-upper for the L.C.P.
Life connecting Program it is a faith Based
Program, I got to Know Keven thow Bible
Study and whele we wore locked Down for
the Covid-19 here at Leavnworth U.S.P
he lived 3 Doors Down from me he also
works in landry so every tuseday night
he would holler Landry By the Door, Alot
of time on tuseday cirly in the Day I
would Holler what Day is it Keven Just
to have Something to do, Keven has made
mistake Just like us All my opinion is
he has leared from his mistake and is
a change Man and a GOD fearing Man,
So I hope This letter help him,

                    Thank you Billy Emery
                    Billy Emy 32037-17

To whom it may concern,

My name is Steven Higgs. I have been incarcerated with Mr. Wyrick for the last two years. I've been participating in differing programs conducted here at USP Leavenworth.

During my time in the honor/program housing unit, I have had the opportunity to observe Mr. Wyrick. The behavior he exhibits here is an inspiration and an example to me. He volunteers to help others, maintains a job and has worked diligently to complete the programs with honor. All the while he keeps a respectful attitude and a smile on his face.

I have benefitted from the guidance of his assitance during my journey. I believe when he is released these lessons learned during his sequestration will continue to benefit others lives.

Thank you,
Steven Higgs

#17466-032

To whom it may concern,

I wanted to take the time to speak about a person whom I feel is given the opportunity, would be an asset to society.

I met Keven in our L C P class (Life Connections).

I use to wonder why is this guy so humble. This can't be his demeanor. However, when we began to get close, I found out why.

Keven is a believer, he is a person who believes in God. His belief system is very simple, treat people how you want to be treated.

Because our class, had to suffer due to the corona virus. We had to be strong, and it was Keven Wyrick's attitude that when the chips were down he was there to lift you up. We needed him more than he thought we did. For that, I am writing this letter, for Keven Wyrick 00724-045 and humbly asking please give him the opportunity to show what a productive member of society he can be.

Glenn
40599050

3-28-17

Dear Sir:

My name is Jerry Wyrick
father of Steven Wyrick. I'm
writing this on his behalf hoping
to get his time reduced in order
I might spend some time with him.

Even though he has been locked
up for about 22 years his entire
family, son, sisters, nephews & inlaws
all love him very much and are
willing to find him a place to
live, a job and a way to get
to and from his work.

Steven has educated himself
since he has been in prison to
a level that he will not have

any problem finding work that he wants to do which is teaching and counciling in theology since he has a Doctors degree and a Doctort of Philosophy in Theology.

As for myself I am 82 Came July 17, 2017 and have worked for Bendix + Honeywell for 33 years as a maintance supervisor, then Worked as a security officer for Red's Contract services that supplied Security for the Federal Buildings in the Heartland area for 18 years, Thirteen of the 18 years was at the new Federal Court house at 601 and I never once mention my son

in prison or asked for any
kind of help. But never him asking
for him and myself to be shown
some leniency so I might be
able to spend a little time
with him for whatever time
I have left.

Respectfully

Jerry Wyrick

EXHIBIT F

Your Honor

I write this letter to the court in regards to the crimes I committed in this indictment. I accept responsibility for the things I did and participated in and have been remorseful beyond expression for many years. I gave my life to the Lord in 1989 and tried to put my past behind me. It wasn't realized at that point, but eventually became apparent, you can't hide from GOD. After coming to prison my walk with the Lord continued and have dedicated my life to bettering myself. I apologize to his family and my family as well for the sadness and hardship thats been caused because of my actions. I cant take it back and am very sorry. I have asked the Lord for forgiveness but really need to ask the family for their forgiveness. I was a stupid young man and am sorry.

Keven Wyrick
08724-045
Keven Wyrick

**EXHIBIT G**



December 12, 2023

Mr. Kevin Wyrick (Reg.No. 08724-045) has served as a suicide watch cadre member since 2014 and has worked at two different BOP institutions. He has been part of the FCI Englewood Suicide Companion Cadre since August 2023. The Cadre provides 24-hour observation for inmates who are deemed in need of suicide watch to maintain their physical safety in a time of crisis. Cadre members are responsible for working four-hour shifts as part of a pre-determined schedule for the duration of a suicide watch. Cadre members receive extensive training consisting of four four-hour trainings per year, in addition to supervision on an as-needed basis. While on shift, Cadre members are tasked with maintaining a constant visual of the inmate on suicide watch, developing rapport with and providing support to the inmate, and documenting any clinically relevant behavioral observations or interactions with the inmate for Psychology Staff's review. Cadre members provide a valuable service to the FCI Englewood Psychology Services' Department and Mr. Wyrick has been a valuable asset to the Suicide Companion Cadre at FCI Englewood.


K. Vigil, Ph.D.
Suicide Companion Cadre Coordinator
Staff Psychologist
FCI Englewood, Psychology Services

To whom it may concern.

Inmate Keven Wyrick 08724-045 has been a regular participant in Chapel services since he transferred here April 2023.

If you have any questions don't hesitate to contact me.

Chaplain Berg

UNITED STATES GOVERNMENT

# memorandum

United States Penitentiary
Leavenworth, Kansas  66048

DATE:        September 29, 2005

REPLY TO
ATTN OF:     Mike Crowell, Supervisory Chaplain

**SUBJECT:   Inmate Wyrick ‎08724-045**

TO:          All Concerned

Inmate Wyrick has been an active participant in the Christian community at USP
Leavenworth since 1997. He has consistently participated in the Sunday morning
Protestant worship services, and has been a positive presence and influence in the
institution. I have seen evidence of a meaningful impact his faith has made on his life.

February 10, 2017

FROM: _S. Wallace_
Recreation

SUBJECT: Keven Wyrick

To whom it may concern,

Keven Wyrick has worked in the Recreation Department at the United States Penitentiary in Marion, Illinois since October 2010 to present. During this time, Mr. Wyrick has worked on multiple work details within the department. Mr. Wyrick often works 7 days a week in order to accomplish the multiple tasks that he is accountable for. During his tenure in recreation, he has displayed an excellent work ethic while exceeding in his roles of responsibility. He has worked on the snow and ice removal crew, the yard mowing crew, as an orderly, as an issue clerk and institutional photographer. His evaluations on these work details are always exceptional and he has been awarded numerous bonuses and achievements for his work performance.



**U.S. Department of Justice**
**Federal Bureau of Prisons**

*United States Penitentiary*

Marion, IL 62959

February 16, 2017

MEMORANDUM FOR ALL CONCERNED

FROM:            C. Wright, Teacher

SUBJECT:            Wyrick, Keven #08724-045

This correspondence serves to inform you that inmate Keven Wyrick is currently enrolled in the USP Marion Vocational Training Program - Information Processing. He has been enrolled since April of 2016, and is in good standing.   He maintains excellent attendance and satisfactory progress in class.   Upon completion of the program, he will receive a college certification for Information Processing from Century College.

Thank you for your time and attention in this manner.

ATTACHMENT ONE

---

**UNITED STATES OF AMERICA, -against- ROCKY FREEMAN, Defendant.**
**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**
**2023 U.S. Dist. LEXIS 180166**
**96-CR-527 (PKC)**
**October 5, 2023, Decided**
**October 5, 2023, Filed**

---

**Editorial Information: Prior History**

United States v. Mateo-Feliz, 199 F.3d 1324, 1999 U.S. App. LEXIS 36068 (2d Cir. N.Y., Oct. 29, 1999)

**Counsel** {2023 U.S. Dist. LEXIS 1}For U.S. Attorneys: Frank McClain-Sewer, LEAD ATTORNEY, McClain-Sewer Associates, New York, NY USA; Thomas M. Sullivan, LEAD ATTORNEY, United States Attorneys Office, Central Islip, NY USA; Anna L. Karamigios, USAO, Brooklyn, NY USA; James R. Simmons, United States Department of Justice, United States Attorney's Office, Brooklyn, NY USA; Jennifer M. Sasso, United States Attorney's Office, Brooklyn, NY USA; Margaret Elizabeth Lee, U.S. Attorney's Office, Eastern District of New York, Brooklyn, NY USA.

**Judges:** Pamela K. Chen, United States District Judge.

Opinion

**Opinion by:** Pamela K. Chen

Opinion

## MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge:

Before the Court is Defendant Rocky Freeman's ("Freeman") request for a reduction in his sentence pursuant to the **compassionate release** provisions of the First Step Act, 18 U.S.C. § 3582(c). (Mot. for **Compassionate Release**, Dkt. 306.)1 The Government opposes the motion. (Gov't Opp'n, Dkt. 309 ("Gov't Opp'n 1"); Gov't Opp'n, Dkt. 332 ("Gov't Opp'n 2").) For the reasons set forth herein, the motion is granted.

## BACKGROUND2

Freeman is currently serving two consecutive life sentences related to his involvement with a drug trafficking organization. Freeman's co-defendant, Roberto Mateo-Feliz, ran the organization,{2023 U.S. Dist. LEXIS 2} which distributed crack and cocaine in a section of East New York, Brooklyn, beginning in approximately 1987. (PSR ¶¶ 5-6.) Mateo-Feliz used various means to protect the organization, including murder or attempted murder of rivals. (Id. ¶ 23.) Between 1989 and 1994, Mateo-Feliz ordered or personally caused the death of five individuals. (See generally id. ¶¶ 28-48.) Freeman reported directly to Mateo-Feliz but held no supervisory role in the organization. (Id. ¶ 71.)

Freeman and three co-defendants, including Mateo-Feliz and Francisco Pellicier, were indicted on various charges in the Fourth Superseding Indictment ("S-4 Indictment"). (S-4 Indictment, Dkt. 106.) Seven other members of the organization had been named in earlier indictments. (See Indictment,

DISHOT

1

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Dkt. 10; First Superseding Indictment ("S-1"), Dkt. 16; Second Superseding Indictment ("S-2"), Dkt. 38; Third Superseding Indictment ("S-3"), Dkt. 58.) The S-4 Indictment contained ten counts, and all defendants were charged with drug conspiracy, in violation of 21 U.S.C. § 841(b)(1)(A), in Count One of the S-4 Indictment ("Count One" or the "drug offense"). (Dkt. 106.) Mateo-Feliz alone was charged with assault in aid of racketeering (Count Five) and use{2023 U.S. Dist. LEXIS 3} of a gun in that assault (Count Six).

The S-4 Indictment also included five counts charging one or more of the defendants with murder while engaging in the drug offense in violation of **21 U.S.C. § 848(e**)(1)(A). Mateo-Feliz alone faced a count for the murder of Jessie Green (Count Two); Mateo-Feliz and Pellicier were charged in the murders of Alfredo Flores (Count Nine) and Billy Mercado (Count Ten); and Mateo-Feliz and Freeman were charged with the murders of Augustin Sosa (Count Three) and Freddy Gonzalez (Count Seven)-murders directed by Mateo-Feliz and purportedly committed by Freeman. Freeman faced two additional charges for use of a firearm during, and in relation to, a crime of violence pursuant to 18 U.S.C. § 924(c)(1) (Counts Four and Eight).

On May 7, 1998, Mateo-Feliz pled guilty to Count Six, use of a firearm, and Count Ten, the Mercado murder. (*See* 5/7/1993 Calendar Entry.) On March 8, 1999, the Honorable Jack B. Weinstein, downwardly departing from the Sentencing Guidelines, sentenced Mateo-Feliz to consecutive terms of 25 years for the murder count and five years on the firearms count, as well as concurrent, five-year terms of supervised release. (*See* 3/8/1999 Calendar Entry; *see also* Judgment as to Roberto Mateo-Feliz,{2023 U.S. Dist. LEXIS 4} Dkt. 207.) According to the Bureau of Prisons ("BOP") website, Mateo-Feliz was released from federal custody on December 9, 2022, after being incarcerated for over 26 years.

Pellicier was named in a subsequently filed, three-count felony information charging him with drug conspiracy, the murder of Flores, and the murder of Mercado. (*See United States v. Pellicier*, 98-CR-382, Dkt. 2.) Pellicier pled guilty to the information, and Judge Weinstein sentenced him, in effect, to ten years in prison and five years' supervised release. (*See id.*, Tr. of 5/13/1999 Hr'g, Dkt. 17.) The pending counts against Pellicier in the instant case were dismissed on the Government's motion. (*See* 5/13/1999 Docket Order.) According to the BOP website, Pellicier was released from federal custody on August 21, 2009, after being incarcerated for over 11 years.

Freeman was the only defendant who went to trial. After a jury trial before the Honorable Sterling Johnson, Jr., Freeman was convicted on three counts: Count One, the drug conspiracy; Count Seven, the Gonzalez murder; and Count Eight, the § 924 charge for use of a firearm in connection with that murder. Freeman was acquitted of the Sosa murder.3 On October 27, 1998, Judge Johnson sentenced Freeman to two{2023 U.S. Dist. LEXIS 5} consecutive life terms on Counts One and Seven, and five years' imprisonment on the § 924 count to run consecutively to the two life terms. (Judgment, Dkt. 190.) He also imposed terms of five years of supervised release on each of the three counts, to run concurrently. (*Id.*)

Freeman appealed, and his conviction and sentence were affirmed by the Second Circuit on October 29, 1999. *See United States v. Mateo-Feliz*, No. 98-1643, 1999 WL 1024616 (summary order) (2d Cir. 1999). In addition to the direct appeal, Freeman has also sought post-conviction relief from this court via several unsuccessful collateral attacks.4 In ruling on one such motion, Judge Johnson denied Freeman's request to reduce his sentence due to a change in the Sentencing Guidelines, finding that the Guidelines offense level underlying the drug conviction was based on the murder, thus making him ineligible for resentencing. (8/21/2009 Mem. & Order, Dkt. 261.) Judge Johnson further noted that even if Freeman were eligible, application of the § 3553(a) factors, such as the serious and violent nature of the crime of murder, weighed against a reduction. (*Id.* at 4 (concluding

DISHOT                                                          2

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

that "[a] sentence of life imprisonment remains sufficient but not greater than necessary to protect the public and deter future crimes by Freeman")).

Freeman now moves pursuant to the First Step Act for **compassionate release** or a reduction in his sentence. He argues in one of his *pro se* submissions that **compassionate release** is warranted given his health and the risks associated with the COVID-19 pandemic. (*See* Dkt. 314.) The motion submitted by Freeman's lawyer on his behalf, however, states that Freeman is no longer seeking relief on the basis of COVID-19, but instead argues that his health and age are appropriate factors to consider. (Dkt. 328, at 3). Freeman ultimately urges the Court to consider four factors: (1) his health and age; (2) the disparity of his sentence as compared with those of his co-defendants and others convicted of the same crimes; (3) his rehabilitation efforts; and (4) whether he poses a future danger to society. (*Id.* at 3.) In support of his motion, Freeman has submitted over 50 letters of support including approximately 16 from family members and friends, 10 from prison officials and staff, and 24 from fellow inmates. He argues that all of these factors make a **compassionate release** or sentence reduction appropriate. Freeman also contends in his *pro se* submission that, pursuant to § 404 of the First{**2023 U.S. Dist. LEXIS 7**} Step Act, he is entitled to a reduction in sentence via retroactive application of the Fair Sentencing Act of 2010 (the "FSA"), which increased the amount of crack required for conviction of certain drug offenses.5 (Dkt. 306, at 2-6.)

In opposition, the Government contends that Freeman has not demonstrated an extraordinary and compelling reason for **compassionate release** or a reduced sentence. The Government's opposition focuses upon criteria set forth in United States Sentencing Guidelines ("Sentencing Guidelines") § 1B1.13. Although the Government acknowledges that the Court is not bound by the Sentencing Guidelines, it suggests that "adopting section 1B1.13 as the definition for 'extraordinary and compelling reasons' would give due respect to Congress' express delegation of definitional power to the Commission." (Gov't Opp'n 2, at 3-4.) Applying the § 1B1.13 criteria, the Government argues that Freeman's medical conditions are not extremely serious or life-threatening, and therefore are not extraordinary and compelling reasons warranting **compassionate release**. (Govt Opp'n 2, at 4.) It notes that while Freeman's conduct in custody has improved over the last eight years, "it is not tantamount to full rehabilitation," and moreover, rehabilitation is not, by itself an extraordinary and compelling reason. (*Id.* at 5.){**2023 U.S. Dist. LEXIS 8**} The Government does not address several of Freeman's arguments including, *inter alia*, those premised on the sentencing disparity between Freeman and his co-defendants. As to Freeman's claim that a reduction in the drug offense sentence is warranted under the FSA, the Government argues that his sentence was not based on any threshold amount of narcotics, but rather was premised on the murder conviction. (Govt Opp'n, at 3.)

## LEGAL STANDARD

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Applewhite*, No. 17-CR-142 (MKB), 2020 U.S. Dist. LEXIS 235378, 2020 WL 7356615, at *3 (E.D.N.Y. Dec. 15, 2020) (quoting *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020)). One such statutory exception is provided in 18 U.S.C. § 3582, the vehicle for defendants seeking "**compassionate release**" from sentences.6 Originally, only the BOP could act on a motion for relief under this section, exercising "absolute control over th[e] mechanism for lenity[.]" *Brooker*, 976 F.3d at 231. However, the First Step Act modified § 3582 to permit a district court to modify a defendant's sentence if the defendant could show that (1) he or she has satisfied the statutory exhaustion requirement, (2) extraordinary and compelling reasons exist warranting a sentence reduction, and (3) a sentence reduction is appropriate "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that{**2023 U.S. Dist. LEXIS 9**} they are applicable," so long as "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18

DISHOT                                                                    3

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

U.S.C. § 3582 (c)(1)(A). It is defendant's burden to show he is entitled to a sentence reduction. *See United States v. Lugo*, No. 01-CR-922 (NG), 2022 U.S. Dist. LEXIS 43458, 2022 WL 732153, at * 7 (E.D.N.Y. Mar. 11, 2022).

When considering a motion for **compassionate release**, the First Step Act "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in [such] motions." *Brooker*, 976 F.3d at 237 (finding that "[b]ecause [Sentencing] Guideline § 1B1.13 is not 'applicable' to **compassionate release** motions brought by defendants [as compared to those brought by the BOP], Application Note 1(D) cannot constrain courts' discretion to consider whether any reasons are extraordinary and compelling"); *see also United States v. Haynes*, 456 F. Supp. 4d 496, 514 (E.D.N.Y. 2020) (the district court has the authority to "determine what 'Other Reasons' (as that term is used in Application Note 1(D)) qualify as 'extraordinary and compelling' regardless of the BOP's view on the matter and without having to await a someday-updating by the Commission of its unquestionably outdated policy statement"). "The only statutory limit on what a court may consider to be extraordinary and compelling{**2023 U.S. Dist. LEXIS 10**} is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" *Brooker*, 976 F.3d at 237-38 (quoting 28 U.S.C. § 994(t) (emphasis added)).

Upon finding that a defendant has demonstrated the existence of extraordinary and compelling reasons for a reduction, the Court must then consider the factors set forth in 18 U.S.C. § 3553(a). *See United States v. Fernandez*, 853 F. App'x 730, 732 (2d Cir. 2021) (summary order) ("Even if 'extraordinary and compelling' circumstances exist, a district court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable" before granting a sentence reduction." (quoting § 3582(c)(1)(A)); *United States v. Schwarzkopf*, No. 21-CR-117 (EK), 2022 U.S. Dist. LEXIS 41811, 2022 WL 706508, at *1 (E.D.N.Y. Mar. 9, 2022) (a showing of extraordinary and compelling reasons "renders [a defendant] eligible for, but not entitled to, a sentence reduction; the court must still consider the Section 3553(a) factors anew"). Among the relevant factors to be considered in deciding a motion for **compassionate release** are: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;" (4) to provide deterrence; (5) to protect the public from the defendant; (6) to rehabilitate the defendant; and (7) the need to avoid unwarranted{**2023 U.S. Dist. LEXIS 11**} sentencing disparities. *United States v. Russo*, 643 F. Supp. 3d 325, 335 (E.D.N.Y. 2022) (citing § 3553(a)). While the factors should be considered by the court, it is not required to "discuss every § 3553(a) factor individually." *United States v. Keitt*, 21 F.4th 67, 72 (2d Cir. 2021) (citation omitted).

## DISCUSSION

### I. Extraordinary and Compelling Circumstances

The Court first turns to whether "extraordinary and compelling reasons" exist to qualify Freeman for compassionate release.7 *Brooker*, 976 F.3d at 236. "The Court need not find a single dispositive circumstance to determine that extraordinary and compelling reasons exist; rather, it may consider whether the totality of the circumstances justify such a finding." *United States v. Piggott*, No. 94-CR-417 (SHS), 2022 U.S. Dist. LEXIS 5293, 2022 WL 118632, at *2 (S.D.N.Y. Jan. 12, 2022). Considering the totality of the circumstances, the Court concludes that Freeman has met his burden of showing that extraordinary and compelling circumstances exist.

### A. Sentencing Disparity

First and foremost, the Court cannot overlook the stark disparity between the sentence Freeman received and the sentences of his co-defendants-particularly, Mateo-Feliz, the gang's leader.

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Mateo-Feliz, the undisputed head of the organization who ordered five killings and to whom Freeman reported, was sentenced to a total of 30 years, and has completed his imprisonment and is a free man; Freeman, convicted of a single murder at Mateo-Feliz's direction,**{2023 U.S. Dist. LEXIS 12}** was sentenced to two life terms plus five years and will spend the rest of his life in prison.8 Based on the circumstances here, the Court cannot find a compelling rationale to justify the disproportionately harsh sentence that Freeman received. *See generally Lugo*, 2022 U.S. Dist. LEXIS 43458, 2022 WL 732153, at *8 (seeing "no reason for [the defendant] to serve a sentence that requires him to die in prison while these other men [from the same criminal organization] serve 30 years").

Although Freeman went to trial-thereby foregoing a potentially favorable plea deal with the Government and the acceptance-of-responsibility reduction under the Sentencing Guidelines-while his co-defendants pled guilty pursuant to plea agreements with the Government, that difference in itself does not justify the dramatic disparity between Freeman's and his co-defendants' sentences, especially given that each of them was convicted of participating in at least one murder. *See Russo*, 643 F. Supp. 3d at 335 (although taking responsibility "should result in a lower sentence . . . , it is often disproportionately reflected in how co-defendants are sentenced and charged"); *Haynes*, 456 F. Supp. 3d at 514 (considering the "extent to which the brutal sentence was a penalty for [defendant's] exercise of his constitutional right**{2023 U.S. Dist. LEXIS 13}** to trial" and finding "drastic severity" between 46-year sentence of defendant who went to trial compared to 10-year sentence imposed on co-defendant who accepted a plea). Mateo-Feliz, allocuted to five murders involving firearms and was sentenced to 25 years in prison for pleading guilty to one of them (Mateo-Feliz PSR ¶ 51), along with a single consecutive five-year term for one § 924 charge; Freeman exercised his right to trial, was acquitted of one murder and convicted of another murder, and ultimately received two life sentences9 plus a consecutive five-year term for the one § 924 conviction. Notably, the Government does not point to any distinguishing facts, such as the two defendants' personal characteristics or their criminal histories, that could explain the gulf between their sentences. The Court finds that the gross sentencing disparity between Freeman and Mateo-Feliz is an extraordinary and compelling factor that favors a sentencing reduction in this case. *See generally Russo*, 643 F. Supp. 3d at 334 (noting that "[c]ourts have found that a gross disparity between sentences of co-defendants stemming from their choice to exercise or forgo their constitutional right to a trial is an extraordinary and compelling**{2023 U.S. Dist. LEXIS 14}** factor."); *United States v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) ("[T]he Court concludes that the gross disparity between [defendant's] and his co-defendant's sentences provides another reason to find that the extraordinary and compelling circumstances of this case warrant a sentence reduction.").10

**B. Defendant's Health**

Freeman points to his age and health condition as additional factors supporting a finding of extraordinary and compelling circumstances. (Dkt. 326, 7-12.) Freeman is 58 years old and suffers from numerous chronic conditions, including hypertension and pre-diabetes, has physical pain in his back, knee, and shoulder, is classified as obese, has acid reflux, and recently underwent hip surgery. (*Id.* at 8; *see also* Dkt. 349-1, Exhibit HH.) Freeman, however, does not provide evidence that these conditions have not been, or cannot be, managed and/or treated in prison. So, in themselves, these conditions do not warrant a sentencing reduction. *United States v. Diaz Osorio*, No. 13-CR-426 (FB) (RER), 2022 U.S. Dist. LEXIS 186544, 2022 WL 7132203, at *1 (E.D.N.Y. Oct. 12, 2022) (denying **compassionate release** for defendant who had health issues including obesity, pre-diabetes, hypertension, and hyperlipidemia).

Freeman no longer suggests that the risk of contracting COVID-19 by itself constitutes an extraordinary and compelling circumstance warranting compassionate**{2023 U.S. Dist. LEXIS 15}** release, and the Court agrees that the risk of COVID infection given Freeman's general health, in

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

itself, would likely not rise to the level of severity warranting **compassionate release**. However, although a defendant's "heightened risk of COVID-19 may not alone suffice as an extraordinary and compelling reason, in combination with the other factors, it weighs towards granting a reduction." *Russo*, 643 F. Supp. 3d at 333; *see also United States v. Nelson*, No. 10-CR-820 (NGG), 2022 U.S. Dist. LEXIS 84554, 2022 WL 1469465, at *5 (E.D.N.Y. May 10, 2022) ("Although the Court generally agrees [] that [the defendant] has not demonstrated that he is a high-risk individual, the Court still considers the pandemic prison conditions as a factor in its analysis."). Therefore, the Court considers Freeman's health issues in combination with his risk of contracting COVID-19 in prison as one of the several factors contributing to its finding that extraordinary and compelling reasons to reduce Freeman's sentence exist. *See United States v. Snype*, __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 124734, 2023 WL 4622870, at *9 (E.D.N.Y. July 19, 2023) (granting **compassionate release** where defendant's "medical situation," which the court found to be not so "serious" to constitute "extraordinary and compelling" on its own, was still "a factor to consider").

**C. Rehabilitation**

Freeman also points to his rehabilitation efforts as further support for a finding of extraordinary and compelling{2023 U.S. Dist. LEXIS 16} reasons warranting a sentence reduction. The Court finds that these efforts provide further support for a sentencing reduction.

In addition to completing his GED, Freeman has completed education courses in a wide range of subjects. Between 1997 and early 2019, Freeman completed approximately 30 courses on subjects such as anatomy, stress management, public speaking, and automotive service tech training. (Summary Reentry Plan, Dkt. 328-21.) Lt. H. Reedy at FCC Allenwood commented that Freeman "has always been program[m]ing and taking classes ever since I have known him," and has been productive in the use of his time. (Dkt. 306, Ex. D3.)

Although Freeman had several disciplinary infractions early in his incarceration, he has not had one since January 2014. (*See* Dkt. 306, Ex. D5.) According to Lt. Reedy, Freeman was transferred to FCC Allenwood in 2012 "after working his way down in security level from Federal Penitentiaries to Federal Correctional Institutions for good behavior. (Dkt. 306, Ex. D3.)

In addition, Freeman's application is supported by approximately 50 letters from family, friends, prison staff, and inmates attesting to his character and urging that he be given a second chance.{2023 U.S. Dist. LEXIS 17} Some of the most compelling letters regarding Freeman's character are letters written by staff members at FCC Allenwood. Capt. L. Hunter writes that Freeman "has always handled himself in a respectful and helpful matter," that he has observed Freeman "going out of his way to help staff and inmates alike," and that he "helps to mentor younger inmates." (Dkt. 306, Ex. D2.) Capt. Hunter believes that Freeman deserves a second chance and that if given one, he "would not waste the opportunity to reconnect with his family and become a productive member of society." (*Id.*) Lt. Reedy writes that Freeman "has been a model inmate who has respect from both inmates and staff alike" and that he often intervenes to stave off a situation "before it would ever become a problem, due to [the] respect level he has from the inmate population." (Dkt. 306, Ex. D3.) Lt. Reedy states that he wishes Freeman a "second chance at life," concluding that "I have never met an inmate more deserving th[a]n Freeman [of] this opportunity." (*Id.*) Lt. J. Olshefski notes that since starting employment with the BOP in 2000, he has never written a letter of recommendation before for any inmate, but "feels strongly that Freeman{2023 U.S. Dist. LEXIS 18} is deserving of a second chance at life in our society." (Dkt 306, Ex. D4.) He has observed Freeman "providing positive feedback to younger inmates on how to behave in a correctional setting," and has "displayed sincere remorse for being incarcerated and not being a part of his son's life." (*Id.*)

DISHOT                                                    6

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Freeman held a steady position at FCC Allenwood in the recreation department, and has submitted numerous Performance Ratings from his supervisor reflecting top marks across the board. (Dkt. 306, Exs. D6-9). Those supervisors, who worked with Freeman each day for multiple hours over a period of years, "only have magnificent things to say" about him (Dkt. 306, Ex. D7), calling him a "great leader" (Dkt. 306, Ex. D9), a "stellar employee," a "role model" who has "obtained the respect of his fellow inmates" (Dkt. 306, Ex. D8), and "an outstanding leader and example for the entire inmate population." (Dkt. 306, Ex. D6.)

Freeman maintains close contact with his family, many of whom have submitted letters in support of his release including, *inter alia*, his mother, brother, sister-in-law, sister, aunt, and cousin. (Dkt 328, Exs. A-G.) Also of note is the letter of support from his adult son, Raheem{2023 U.S. Dist. LEXIS 19} Freeman. (Dkt. 328, Ex. I.) In it, Raheem discusses the "3Ds" or "Discipline Determines Destinies" organization, a concept for a youth organization that he and his father have worked on together. Freeman came up with the concept and created logos, and Raheem has registered the organization with the New York Department of State and made contact with community leaders. "I have started the process but I wait for his release so we can really put in the work together as father and son to truly change lives and communities." (*Id.*)

Freeman's record of educational accomplishments, continuous and steady work, and sterling letters of support from prison staff, inmates, family, and friends-collectively highlighting his character, leadership qualities, willingness to mentor other inmates, and desire to better the community-are impressive and noteworthy. The Government argues that Freeman's conduct "is not tantamount to full rehabilitation." (Govt Opp'n, at 5.) Freeman's rehabilitation, however, must be viewed through the lens of an individual facing life in prison. In spite of receiving two life sentences (plus five additional years) and spending nearly half of his life in prison, Freeman has made{2023 U.S. Dist. LEXIS 20} the most of his circumstances and sought to help others. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 313 (S.D.N.Y. 2020) ("That [defendant] has developed such an outstanding record in prison without any tangible incentive other than self-improvement, given that his life sentence meant that he could neither earn any good time credit nor receive any other sentence reduction benefit weigh[ed] all the more strongly still [in favor of modifying defendant's sentence].") (internal quotations and citation omitted)). And while the Court recognizes that rehabilitation alone cannot constitute an extraordinary and compelling reason, his strong record in this regard is yet another factor in favor of a sentencing reduction, and a compelling one at that. *See Snype*, 2023 U.S. Dist. LEXIS 124734, 2023 WL 4622870, at *10 ("[R]ehabilitation alone is not enough, but I do not consider Snype's rehabilitation in a vacuum.").

\*\*\*

Although each reason presented, viewed in isolation, might not suffice to warrant a sentence reduction, the factors presented by Freeman-the unjustifiably large sentencing disparity between Freeman and his co-defendants, his deteriorating health and the increased risk of harm from COVID-19 infection, and his strong record of rehabilitation-constitute extraordinary and compelling circumstances.

### III.{2023 U.S. Dist. LEXIS 21} Section 3553(a) Factors

Having found that Freeman has demonstrated extraordinary and compelling reasons for relief, the Court analyzes the relevant § 3553(a) factors: (a)(1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (a)(2) the need for the imposed sentence (A) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" (B) "to afford adequate deterrence to criminal conduct[,]" and (C) "to

DISHOT                                                              7

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

protect the public from further crimes of the defendant"; and (a)(6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See generally* 18 U.S.C. §§ 3553(a); *see also Keitt*, 21 F.4th at 72 (a district court is not required to "discuss every § 3553(a) factor individually."). On the record before it, the Court finds that application of the § 3553(a) factors support a reduction in Freeman's sentence and that maintaining his current sentence would result in a sentence that is "greater than necessary[] to comply with the purposes of [§ 3553(a)(2)]." 18 U.S.C. § 3553(a).

As for the nature and circumstances of the offense, the seriousness of Freeman's crimes cannot be overstated. Indeed, the Government argues that**{2023 U.S. Dist. LEXIS 22}** "the gravity of the crimes for which [Freeman] was convicted" weigh against release. (Govt Opp'n 2, at 6.) The Government's arguments regarding the need for the sentence to reflect the seriousness of the crime and to provide just punishment and adequate deterrence, however, are directed solely at Freeman's offense conduct and do not account for his personal "history and characteristics," especially with respect to post-sentence rehabilitation. Freeman's prior offenses occurred nearly three decades ago and he "has maintained a positive prison record," if not an exemplary one, despite having no reasonable expectation of release, over the past decade. *Snype*, 2023 U.S. Dist. LEXIS 124734, 2023 WL 4622870, at *10 (finding that despite committing multiple armed robberies, engaging in a high-speed chase where the defendant shot at law enforcement officers, and actions that led to the death of an accomplice, the length of time since defendant's offenses and his good prison record militated against the seriousness-of-the-crime sentencing factor). Freeman also maintains strong connections with his family and has been a mentor to those in his prison community during his lengthy incarceration. Additionally, courts in this circuit have granted compassionate**{2023 U.S. Dist. LEXIS 23}** release to prisoners serving life sentences notwithstanding convictions for heinous crimes. *See, e.g., United States v. Fisher*, 493 F. Supp. 3d 231, 236, 239 (S.D.N.Y. 2020) (granting release after thirty-eight years of defendant who likely murdered multiple victims during course of significant drug trafficking conspiracy); *Rodriguez*, 492 F. Supp. 3d at 308 (reducing sentence to thirty years where defendant participated in torture and murder of government informant). Indeed, as discussed, Freeman's co-defendants received far more lenient sentences despite committing equally-and in Mateo-Feliz's case, much more-serious crimes.

As to the need to avoid disparate sentences, the Government's argument against **compassionate release** does not acknowledge the vast disparity between the sentence Freeman received versus the sentences of his co-defendants for committing the same or similar crimes, including murder. The differences between sentences given to defendants who went to trial and those who took plea deals "is not only a factor worthy of consideration as an extraordinary circumstance, but also is a powerful § 3553(a) factor." *Russo*, 643 F. Supp. 3d at 335. For the reasons discussed above, the gross sentencing disparity here weighs heavily in Freeman's favor. The implied argument that only a life sentence is adequate to constitute**{2023 U.S. Dist. LEXIS 24}** a just punishment and serve as a deterrent in this case is belied by the fact that Mateo-Feliz, who not only led an enormous trafficking organization, but was responsible for at least five murders and directed the murder that Freeman was convicted of, was offered a plea deal that resulted in a 30-year sentence (25 years for the murder and five years for the gun charge). As the court in *Russo* observed, "[i]f the Government in offering its plea deals did not believe that all those indicted on murder charges should be sentenced to life, why should the court?" *Russo*, 643 F. Supp. 3d at 335. At a minimum, it is reasonable to infer that the Government believed that a 30-year sentence for a defendant who was a drug kingpin and admitted involvement in five murders complied with the purposes of sentencing codified in § 3553(a)(2), such as reflecting the seriousness of the crime, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence to criminal conduct, and protecting the public from future harm by Mateo-Feliz.

DISHOT                                                             8

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

The Court finds that, as discussed *supra*, the disparity of Freeman's sentence as compared with his co-defendants, particularly that of Mateo-Feliz, is overly harsh and does not{**2023 U.S. Dist. LEXIS 25**} constitute "just punishment" under the circumstances of this case. 18 U.S.C. § 3553(a)(2)(A). Freeman has, to date, served over 26 years in custody. Thus, Freeman's time in prison is also above the national average for federal sentences for murder, which in recent years, was a sentence of approximately 22 years. *See United States v. Tellier*, No. 92-CR-869 (LGS), 2022 U.S. Dist. LEXIS 84489, 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022) (citing U.S. Sentencing Commission data showing that "the median sentence length for murder for fiscal years 2015 through 2021 was 240 months, the median length of imprisonment was 240 months, the average sentence length was 262 months and the average length of imprisonment was 263 months"); *Lugo*, 2022 U.S. Dist. LEXIS 43458, 2022 WL 732153, at *10 (citing data showing the recent average federal murder sentence to be "slightly over 20 years"). As with his co-defendants and consistent with national averages, a sentence less than life would adequately serve to confirm the seriousness of the crime, constitute a just punishment, and serve as a deterrent.

As for the need to protect the public from future crime by Freeman, the Court notes that his crimes in this case were committed in the context of a complex drug conspiracy. Gonzalez, Freeman's victim, was a rival drug dealer whose murder was ordered by Mateo-Feliz after Gonzalez failed to pay for cocaine{**2023 U.S. Dist. LEXIS 26**} he had received on consignment. (PSR ¶ 9.) Therefore, Freeman's crime, albeit violent, is not one that involved the public at large. *See Russo*, 2022 U.S. Dist. LEXIS 213643, 2022 WL 17247005, at *8 (finding defendant unlikely to pose a danger to the general public where defendant was convicted for murders that "were not directed at the public at large but were internecine executions of ruthless rival gang members.").11 Regarding the risk of recidivism as to drug trafficking, because Freeman was not involved in the day-to-day operations of Mateo-Feliz's organization, there is no reason to believe that he would become involved in the drug trade in any way if released from prison.

Finally, the Court is satisfied that upon his release, Freeman will take advantage of his support system of family and friends to help him acclimate to life outside of prison and help him lead a law-abiding and productive life in the community. *See, e.g.*, Dkt. 328, Ex. A (brother states that the family is prepared to help him, having a "plan for his travel, permanent housing, and how we will support him" and "ensuring he has the necessary things (food, clothing and shelter)"); Dkt. 328, Ex. F (sister plans to take FMLA leave to assist in his re-entry); Dkt. 328, Ex. I (son's{**2023 U.S. Dist. LEXIS 27**} letter describing the "3Ds" youth organization he and his father plan to develop if Freeman is released).

Having considered all the § 3553(a) factors, including the nature of Freeman's crimes and his history, the Court believes that a sentence reduction is warranted.12

**CONCLUSION**

For the reasons set forth above, Freeman's motion for **compassionate release** is granted, and his sentence of two consecutive life terms and one consecutive five-year term of imprisonment is modified to:

- Ten (10) years on Count One to run concurrently with the sentence on Count Seven,

- Twenty Five (25) years on Count Seven to run concurrently with the sentence on Count One,

- Five (5) years on Count Eight, to run consecutively to the sentences on Counts One and Seven,for a total of thirty (30) years' imprisonment, to be followed by two years of supervised release on each count to run concurrently with each other. All other aspects of Freeman's

DISHOT                                              9

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

sentence remain in full force and effect.

The Clerk of Court is respectfully directed to prepare the appropriate amended judgment.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen

United States District Judge

Dated: October 5, 2023

Brooklyn, New York

## Footnotes

1

Three docket entries, Dkts. 306, 314, and 328, are filed as separate motions, but seek the same relief on different bases. The first two filings were made by Freeman proceeding *pro se* while the third was submitted by appointed counsel. The Court considers these submissions as a single motion under Dkt. 306, and Dkts. 314 and 328 will be terminated. Additional filings intended to supplement the record were also erroneously filed as motions. The Court has considered the later-filed materials as supplemental submissions in support of the motion; accordingly, motions docketed as numbers 336, 338, 340, 343, 345, 347, and 349 were terminated on August 31, 2023. (*See* 8/31/2023 Dkt. Order.)

2

The factual background here is taken from the Presentence Investigation Report (the "PSR") dated September 10, 1998, and subsequent amendments thereto.

3

In light of the acquittal on the predicate murder charge, the jury did not consider Count 4, the related § 924(c) count.

4

{*2023 U.S. Dist. LEXIS 6*}*See Freeman v. United States*, No. 01-CV-720 (SJ), 2005 U.S. Dist. LEXIS 46061, 2005 WL 1498289 (E.D.N.Y. June 17, 2005) (denying relief under 28 U.S.C. § 2255), *aff'd*, 258 F. App'x 372 (2007); Dkts. 277, 282 (successive §2255 motion and denial of that motion). The Court presumes the parties' familiarity with those motions; any discussion of the resulting decisions is limited to those relevant to the resolution of the motions currently before the Court.

5

Because the Court decides this motion on the basis of extraordinary and compelling circumstances, it need not reach Freeman's arguments regarding his eligibility for resentencing pursuant to § 404(b) of the First Step Act, which made retroactive the Fair Sentencing Act's increased threshold quantities of cocaine base required to trigger mandatory minimum sentences under the Controlled Substances Act.

6

"It bears remembering that compassionate release is a misnomer," as the section "in fact speaks of sentence reductions." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). In granting a

DISHOT                                              **10**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

motion, a district court "could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Id.*

7

There is no dispute that Freeman has exhausted his administrative remedies. His request for compassionate release addressed to the BOP was denied on May 19, 2020. (Dkt. 314, Ex. A.)

8

This analysis focuses on Freeman's murder conviction because the life sentence he received on the drug conspiracy was derived from Guidelines calculations necessitated by the murder conviction. As to Freeman's co-defendants, Mateo-Feliz did not plead guilty to the drug conspiracy and Pellicier's plea to the drug conspiracy and two murders netted him 10 years in prison. (*United States v. Mateo-Feliz*, 96-CR-527, Dkt. 207; *United States v. Pellicier*, 98-CR-382, Dkt. 8.) Other co-defendants who were not charged with murder received lower sentences upon pleading guilty to the drug offense. The highest of these was 70 months imposed upon Giovanni Rubiroza. (*See United States v. Mateo-Feliz*, 96-CR-527, 6/10/1999 Calendar Entry.)

9

Although convicted of only one murder, for which he received one non-mandatory life sentence, Freeman was sentenced to a second non-mandatory life term for his conviction on the drug offense in Count 1, based on a killing having resulted from that conspiracy. *See* 18 U.S.C. § 1111.

10

To be clear, the Court does not find that Freeman's sentence was unconstitutionally vindictive or that there is any evidence to support an attack on the validity of the sentence.

11

Indeed, the only victim in this case who was uninvolved in the drug trade and was, in effect, an innocent bystander, was a man murdered under the orders and in the presence of Mateo-Feliz. (PSR ¶ 26.)

12

Judge Johnson reached a different conclusion in his August 2009 decision applying the § 3553(a) factors and denying a reduction in sentence. However, during the intervening 14 years and despite the denial, Freeman continued to conduct himself in an exemplary manner in prison, not only by avoiding disciplinary infractions and working, but by increasing his educational programming and by becoming a role model and mentor to other inmates, thereby earning the respect of prison staff and inmates alike, as well as their unequivocal support for his renewed application for a sentencing reduction.

DISHOT

**11**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT TWO

> **UNITED STATES OF AMERICA v. SHAHEEM JOHNSON, Defendant.**
> **UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**
> **2023 U.S. Dist. LEXIS 138382**
> **Case No. 1:97-cr-314-AJT**
> **August 8, 2023, Decided**
> **August 8, 2023, Filed**

**Editorial Information: Subsequent History**

Appeal filed, 09/11/2023

**Editorial Information: Prior History**

United States v. Johnson, 219 F.3d 349, 2000 U.S. App. LEXIS 16931 (4th Cir. Va., July 17, 2000)
**Judges:** {2023 U.S. Dist. LEXIS 1}Anthony J. Trenga, Senior United States District Judge.

## Opinion

**Opinion by:**     Anthony J. Trenga

## Opinion

## MEMORANDUM OPINION & ORDER

Defendant Shaheem Johnson ("Defendant" or "Johnson")1 has filed a Motion for **Compassionate Release** pursuant to 18 U.S.C. § 3582(c)(1)(A). [Doc. No. 676] (the "Motion"). On March 29, 2023, the Court held a hearing on the Motion, following which it took the Motion under advisement. Upon consideration of the Motion; the memoranda in support thereof and opposition thereto; the evidence, arguments, and statements at the hearing; and for the reasons stated below, the Motion is GRANTED IN PART and Johnson's sentence is reduced to 420 months, followed by 10 years of supervised release.

### I. BACKGROUND

#### A. Offense Conduct, Trial, and Sentencing

Briefly summarized, for five years in the mid-1990s, Johnson and his twin brother, Raheem Johnson ("Raheem"), engaged in large-scale illegal drug distribution in four states and the District of Columbia. [Doc. No. 704] at 3.2 On December 17, 1998, following a jury trial, Johnson was convicted of twelve offenses,3 after which this Court, Judge Lee presiding, sentenced Johnson as follows, with the italicized brackets denoting the mandatory minimum, either by statute or the then mandatory guidelines:{2023 U.S. Dist. LEXIS 2}

**Table 1**

[Doc. No. 500]. In total, Johnson was sentenced to two life terms plus 790 months imprisonment consecutive to his life sentences. Counts 13, 15, 18, and 19 ran concurrently to Count 2 and have already been served.

The Government attributes responsibility to Johnson for five deaths, specifically the killings of

DISHOT                                                    1

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Bernard Franklin{**2023 U.S. Dist. LEXIS 3**} ("Franklin"), Richard Villa ("Villa"), Antonio Stevens ("Stevens"), Shawn Thomas ("Thomas"), and Tracy Morgan ("Morgan"), Thomas' girlfriend. *See* [Doc. No. 704] at 1 (describing Johnson as someone who "planned, participated in, or sanctioned the murders of five individuals."). This position is principally based on Johnson's overall leadership role and his conviction on Count 111 for a drug conspiracy, which was later vacated as a lesser-included offense of Count 2, which charged operating a continuing criminal enterprise.12 However, Johnson was only charged specifically in connection with the deaths of Franklin and Villa. In that regard, Franklin's death was the basis of the charge against Johnson in Count 3 (for murder in aid of racketeering) and in Count 4 (for murder using a firearm during a drug trafficking offense). According to the PSR, Johnson planned to kill Franklin after learning that Franklin had purportedly sexually assaulted his (Johnson's) girlfriend and stole $100,000 in drug proceeds. PSR ¶¶ 43-45. Franklin was killed after a struggle ensued while Franklin and Johnson were in a room gambling, during which Johnson shot Franklin, though, it appears, not fatally. *Id.* Johnson's{**2023 U.S. Dist. LEXIS 4**} brother Raheem then shot Franklin in the back of the head, following which Rickey Piranti ("Rickey") and Damein Piranti ("Damein") also shot Franklin. *Id.* As to both Counts 3 and 4, the jury found Johnson guilty of the lesser-included offenses of voluntary manslaughter, [Doc. No. 704] at 5-6, and he was sentenced on Count 4 to 70 months consecutive to his life sentence on Count 2, with the parties stipulating to the dismissal of Count 3.

Villa's death was the basis for the charge against Johnson in Count 5 (for murder in aid of racketeering). Villa was killed after the Johnson twins and Eldon Brown ("Brown") learned that Villa planned to rob and murder the Johnsons. PSR at ¶ 46. The jury convicted Johnson of aiding and abetting Villa's murder under 18 U.S.C. § 1959(a)(1). It also specifically found in response to special interrogatories, submitted to them for the purpose of determining whether to impose the death penalty, that Johnson did not{**2023 U.S. Dist. LEXIS 5**} substantially plan or premeditate Villa's murder and did not procure the commission of the murder by payment or promise of pecuniary value. [Doc. No. 699-15] at 3.13 Additionally, ten of twelve jurors found that Johnson's "participation [in Villa's murder] was relatively minor." *Id.* at 7.

Johnson was not specifically charged or implicated in connection with Antonio Stevens' death in Count 1, [Doc. No. 699-16] at 10,14 or the presentence report, PSR ¶¶ 41-42. Similarly, Johnson was not charged in connection with Thomas' murder, which was charged in Counts 8 and 9 against Raheem; and it is undisputed that Johnson was not present when Thomas was killed. Johnson also was not charged with Morgan's tragic murder, nor is it alleged that he sanctioned or had any advance knowledge of it, which occurred when she happened to be with Thomas, her boyfriend, when he was killed by Raheem and Rickey.15 *But see* PSR Addendum at 2 (justifying inclusion of Morgan, Thomas, and Stevens in the PSR because their deaths were purportedly reasonably foreseeable and jointly undertaken activity).

**B. Post-Trial Activity**

Following the jury verdict, Johnson moved for a new trial. The motion was largely denied, although his{**2023 U.S. Dist. LEXIS 6**} conviction in Count 1 was vacated as a lesser included offense of Count 2. Additionally, as previously detailed, Count 3 was dismissed pursuant to a stipulation. Johnson then filed a direct appeal on the grounds that the district court erred with respect to the jury instructions, admission of hearsay statements, denial of a motion for severance, and refusal to permit certain testimony, and that there was insufficient evidence with respect to Count 5. The Fourth Circuit found the district court committed plain error with respect to a portion of the jury instructions but declined to grant relief on that basis and otherwise affirmed his convictions.

In 2001, Johnson filed a § 2255 Motion to Vacate his sentence. This Court, Judge Lee presiding,

DISHOT                                    2

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

denied the Motion, the Fourth Circuit declined to issue a certificate of appealability, and the appeal was dismissed. In 2014, the Court construed a Motion by Johnson as a second § 2255 petition challenging the sentence imposed in Count 5. Johnson also filed a motion under 18 U.S.C. § 3582(c)(2) for a reduction of sentence with respect to Counts 15 and 19. The Court, Judge Lee presiding, denied both motions and no appeal was filed.

In February 2021, Johnson requested compassionate{2023 U.S. Dist. LEXIS 7} release from the warden at FCI Hazelton. The next month, Johnson filed a Motion for **Compassionate Release**, *pro se*, which is now before the Court. Johnson's *pro se* Motion was largely based on his stacked sentences, his age at the time of the offense, and the risk factors associated with COVID-19. In May 2021, Johnson filed another **compassionate release** request with the warden, also detailing his personal background, good behavior in prison, sentencing under a since-changed statute, familial support, remorse, and pledge to not reoffend. Days later, Johnson filed his reply to the Government's opposition to his Motion.

Shortly after Johnson filed his *pro se* Motion for **Compassionate Release**, the Office of the Public Offender (the "OFPD") sought appointment as Johnson's counsel and later sought leave to file a supplemental memorandum in support of Johnson's Motion, which the Court granted. In February 2023, the Court appointed the OFPD as Johnson's counsel.

As set out in the OFPD's supplemental memorandum, Johnson now seeks **compassionate release** on the following eight grounds: (1) rehabilitation; (2) age during offense; (3) *United States v. **Booker***, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); (4) sentencing disparities; (5) stacked § 924(c) convictions; (6) plain{2023 U.S. Dist. LEXIS 8} error in jury instructions; (7) insufficiencies with respect to two of the three stacked convictions; and (8) purported eligibility for resentencing on Count 2.16 *See generally* [Doc. No. 699]. On March 29, 2023, the Court held a hearing on the Motion, which Johnson attended and addressed the Court remotely, following which the Court took the Motion under advisement.

## II. LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), a court may modify a sentence upon motion of the defendant, subject to certain exhaustion requirements, after considering any applicable factors set forth in 18 U.S.C. § 3553(a), if extraordinary and compelling reasons warrant a reduction.17 18 U.S.C. § 3582(c)(1)(A). While § 3582(c)(1)(A) requires that any reduction be consistent with applicable policy statements issued by the Sentencing Commission, the Fourth Circuit has determined that there are "no 'applicable' policy statements governing **compassionate release** motions filed by defendants . . . and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (quoting in part *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020) (emphasis in original)).

## III. ANALYSIS - EXTRAORDINARY AND COMPELLING REASON

The Court finds that as a threshold matter it has jurisdiction to{2023 U.S. Dist. LEXIS 9} consider the Motion and Johnson has satisfied the exhaustion requirement.18 Accordingly, the initial inquiry is whether there exists any extraordinary and compelling reasons that warrant a reduction in Johnson's sentence.

### A. Rehabilitation

Johnson points centrally to his rehabilitation as an extraordinary and compelling reason for relief. While rehabilitation alone may not constitute *the* extraordinary and compelling reason for relief, 28

DISHOT                                              3

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

U.S.C. § 994(t), it may be considered among other factors. *McCoy*, 981 F.3d at 286 n.8 ("there is no indication that successful rehabilitation efforts may not be considered *as one among other factors* under § 3582(c)(1)(A)(i)") (emphasis added).19 Consequently, a strong record of rehabilitation in the Bureau of Prisons ("BOP") is one factor that may weigh in favor of granting **compassionate release**. *Id.* at 286 (affirming district courts' grants of **compassionate release** and noting defendants "had established excellent institutional records and taken substantial steps toward rehabilitation").

There is no doubt that in the more than quarter-century that Johnson has spent in the BOP for his offenses, he has engaged in activities that reflect an extraordinary commitment to rehabilitation. He has been a model inmate for over a decade,**{2023 U.S. Dist. LEXIS 10}** a fact that the Government does not appear to dispute. He has received dozens of certificates, completed nearly 1,000 hours of education classes, and served as an instructor in the Bounce Back Transition Unit Program. [Doc. No. 699] at 12-13. He has taken a variety of career-related classes, including passing the West Virginia electrician license exam and graduating with high marks from a paralegal program. *Id.* at 13. He has also attended victim impact, violence prevention, and critical thinking classes and taught and mentored others in both formal and informal roles. *Id.* In particular, Johnson has participated in the Inside-Out Prison Exchange Program and has worked with college students, as both an inmate-student and facilitator, to study social justice issues and ways to reduce recidivism. *Id.* at 14. He is also involved in a think tank program that aims to reduce recidivism and assist with re-entry. *Id.* at 14-15. He has also participated in other programs, and the record contains numerous letters from other inmates about his mentorship, continued relationship with his family, and reduction in his BOP risk assessment. *Id.* at 16-18. BOP staff have even recognized Johnson as "instrumental**{2023 U.S. Dist. LEXIS 11}** to aiding other inmates in the Transition Unit in pursuit of their release and reentry goals" and that he "can be counted on to lead his peers by example." [Doc. No. 699-3] at 4.

In summary, Johnson's efforts at rehabilitation have been exceptional, particularly given so much of his rehabilitative activities occurred before passage of the First Step Act when there were no significant prospects for release and it appeared that he would serve his life sentences without reduction, reflecting that his motivations for rehabilitation are by all indications sincere. Notwithstanding the extremely serious conduct that gave rise to Johnson's incarceration, and that rehabilitation alone cannot be grounds for relief, Johnson's rehabilitation weighs heavily in his favor. *See United States v. Gray*, No. CCB-95-364, 2021 U.S. Dist. LEXIS 88855, 2021 WL 1856649, at *6 (D. Md. May 10, 2021) (granting **compassionate release** and noting "other federal district courts have reduced oncemandatory life sentences of defendants who, like [defendant], were convicted of murder under 18 U.S.C. 1959(a)(1) when they were very young and, with no possibility of release, afterwards committed their lives to their rehabilitation and to mentoring others") (citations omitted).

**B. Age at the Time of the Offense Conduct**

In *McCoy*, the Fourth Circuit repeatedly**{2023 U.S. Dist. LEXIS 12}** noted the defendants' youth as relevant factors in determining whether extraordinary and compelling circumstances existed. *McCoy*, 981 F.3d at 274, 279, 286, 288 (noting approvingly that the district courts conducted "individualized inquiries, basing relief . . . on such factors as the defendants' relative youth at the time of the offenses"). While Johnson had a more significant criminal history than the defendants in *McCoy*, and his conduct for these offenses began at age 20 and continued for five years, [Doc. No. 704] at 15, the pronouncements in *McCoy* do not limit consideration of age only where there is no significant prior criminal history or for those younger than Johnson at the time of their offense conduct. *See McCoy*, 981 F.3d at 286 (noting the defendants in *McCoy* ranged in age from 19-24 at the time of their offenses); *cf. Jones v. Mississippi*, 141 S. Ct. 1307, 1314, 209 L. Ed. 2d 390 (2021) ("youth matters in sentencing"); *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 476 (4th Cir. 2021), *as amended* (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021)

DISHOT                                                                                          4

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

(Wynn, J., dissenting) ("[M]odern research also instructs that the prefrontal cortex, the part of the brain that makes it possible to exercise good judgment when presented with difficult life situations, does not finish maturing until age 25.") (citations and quotation omitted).

In *United States v. Ramsay*, one federal court specifically addressed the{2023 U.S. Dist. LEXIS 13} consideration of age within a similar context. There, the defendant was sentenced to life in prison following his conviction for murder in aid of racketeering - the same offense that Johnson was convicted of in Count 5. 538 F. Supp. 3d 407, 409 (S.D.N.Y. 2021). In *Ramsay*, the defendant and two others, all gang members and drug dealers, fired into a crowd killing two bystanders. *Id.* One of those bystanders was pregnant, and the baby died following an emergency delivery. *Id.* After passage of the First Step Act, the Southern District of New York, Judge Rakoff presiding, considered whether "an offender's youth, combined with society's evolving understanding of the adolescent brain, [can] constitute [extraordinary and compelling] circumstances?" *Id.* Following a thorough analysis of Supreme Court precedent, attributes of adolescents, including immaturity, susceptibility, salvageability, and dependence, and reasons why youth matters, the court found that an offender's youth could serve as an extraordinary and compelling circumstance and reduced the life sentence to a term of 360 months. *Id.* at 409, 415-423; *see also* U.S. Sentencing Commission, *Youthful*

*Offenders in the Federal System*, at 5 (May 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/201 70525_youthful-offenders.pdf{2023 U.S. Dist. LEXIS 14} (last visited Aug. 4, 2023) ("The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.").

In addition to his age, the Court has also considered his offense conduct, as Johnson has urged, "in tandem with the incredible abuse, neglect, and trauma that he suffered as a child."20 [Doc. No. 706] at 4. There is no doubt that Johnson's upbringing was full of abuse, neglect, and trauma. Absent a father and with a mother addicted to heroin, Johnson was in and out of foster care throughout his childhood. *Id.* at 5. He was molested as a child and repeatedly hospitalized for a variety of injuries, including those sustained after falling off a roof and being shot at age 16. *Id.* at 5-6. Further, he was exposed to a world of drug dealers at a very young age and was repeatedly robbed at age 12 while working a paper route. *Id.* While nothing excuses Johnson's conduct, the horrific circumstance in which he was raised is properly to be considered in connection with his age at the time of his offense conduct;{2023 U.S. Dist. LEXIS 15} and his ability to serve in the BOP without any disciplinary issues for the past decade is evidence of his subsequent maturity. Accordingly, Johnson's age at the time his offense conduct began, continuing through his arrest, weighs in favor of relief.

**C. *Booker***

In *United States v. **Booker***, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Supreme Court found the Sentencing Guidelines to be advisory, not mandatory. However, ***Booker*** is not retroactive. *United States v. Morris*, 429 F.3d 65, 72 (4th Cir. 2005); *cf. Jones v. United States*, 431 F. Supp. 3d 740, 743 (E.D. Va. 2020) (noting that by not making ***Booker*** retroactive, there is "a lost generation, a group caught in a national purgatory, where individual citizens pay penance for the constitutional errors of the sovereign"). Unsettled by the Supreme Court or the Fourth Circuit is whether the Court may consider ***Booker*** as a factor in the extraordinary and compelling analysis.

The Government urges the Court to follow the Sixth Circuit's decision in *United States v. Hunter*, 12 F.4th 555 (6th Cir. 2021) and reject any reliance on ***Booker*** in determining whether there is an extraordinary and compelling reason for relief. *See id.* at 563 ("The district court erred when it considered *Booker*'s non-retroactive change in sentencing law as a factor to support an

DISHOT                                                                5

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

'extraordinary and compelling' reason for [defendant]'s release."). But at least one district court in the Fourth Circuit has expressly declined{2023 U.S. Dist. LEXIS 16} to follow *Hunter. See United States v. Browning*, No. 2:98-00134, 2022 U.S. Dist. LEXIS 97648, 2022 WL 1787133, at *4 n.7 (S.D.W.V. June 1, 2022) (rejecting *Hunter* and noting that the "Fourth Circuit has not explicitly held that pre-***Booker*** sentences cannot be a factor for **compassionate release**. Indeed, given the discretion granted to courts in *McCoy* and [*United States v.] Kibble*[, 992 F.3d 326 (4th Cir. 2021)], the court believes it is permitted to consider this nonretroactive change in sentencing law as a factor for release under § 3582."). And this Court, Judge Payne presiding, has cited ***Booker*** and ultimately granted **compassionate release** to a defendant serving life because, *inter alia*, "if the guidelines had not been mandatory at the time of [defendant's] sentencing, the Court would not have imposed a life sentence." *United States v. Scruggs*, No. 3:99-cr-200, 2021 U.S. Dist. LEXIS 137242, 2021 WL 3115819, at *4 (E.D. Va. July 22, 2021).21 The Court finds little jurisprudential reason not to consider ***Booker*** in determining whether extraordinary and compelling reasons exist.22

As an initial matter, whether ***Booker*** would have affected the Court's ability to impose a sentence other than Life on Count 2 is unclear given the surprising lack of clarity surrounding what specific offense was charged in Count 2.23 In that regard, the Amended Judgment lists Count 2 as a violation of 21 U.S.C. § 848, [Doc. No. 500] at 1, as does the second superseding indictment, [Doc. No. 699-16] at 19. But neither document specifies{2023 U.S. Dist. LEXIS 17} whether Johnson was charged and convicted under § 848(a), which carries a mandatory minimum sentence of twenty years up to life, or § 848(b), which imposes either a **mandatory life** sentence or death. Had Johnson been convicted under § 848(a), given the base offense level of 38, PSR p. 40, and criminal history category 3, PSR p. 49, his guideline range for Count 2 would have been 292-365 months based on the 1998 sentencing table. A life sentence would have therefore been outside the then mandatory guidelines range; moreover, today under ***Booker*** the Court could impose for that offense a sentence less than the guidelines. On the other hand, were Johnson charged under § 848(b), Johnson faced then, and would today face, a **mandatory life** sentence with the Court having no ability under ***Booker*** to impose a lesser sentence. Neither the second superseding indictment, verdict,24 nor judgment specified a charge/conviction under § 848(b); and neither counsel for the Government nor Johnson could provide any further clarity on the issue at the hearing, even though both represented that they had investigated the issue and would otherwise be inclined to assume a § 848(a) charge by default. Significant in this regard is a letter dated September 1, 2021{2023 U.S. Dist. LEXIS 18} from Judge Lee, the sentencing judge, which shed some light on the basis on which Judge Lee acted:

> I was the judge who heard the trial and sentenced Shaheem Johnson. At the time of his sentencing, if I were I [sic] not bound by the mandatory US Sentencing Guidelines and **mandatory life** sentence by statute, **I would have imposed a substantial sentence of years, not life without parole**. I thought then and now that the Shaheem Johnson sentence was excessive.[Doc. No. 706-1] (emphasis added). Given the reference to both a "**mandatory life** sentence by statute" in the singular, not plural, as well as the then "mandatory US Sentencing Guidelines," Judge Lee's letter can be read to suggest that the "**mandatory life** sentence by statute" refers to Count 5, and "the mandatory US Sentencing Guidelines" refers to the sentence imposed on Count 2, charged as § 848(a), even though the life sentence he received on that Count was above the guideline sentence.25 Notably, the sentences for Counts 13 and 18 appear to also have been outside the ten mandatory guidelines. *See, supra*, n. 8-9.

Also significant for the purposes of assessing whether a sentence reduction is warranted is a letter that Johnson received from{2023 U.S. Dist. LEXIS 19} the jury foreman,26 where the foreman stated as follows:

DISHOT                                                          6

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

I want you to know that when the jury, with me as foreman, found [] you guilty of the charges, and recommended the life sentence, we did so because those were our only two choices. We did not feel the death sentence was warranted, and so **we had only a life sentence to choose. Had we been able to recommend a sentence of considerable time, with the chance for parole, I believe there were enough people in the group who believed that was right**, that we likely would have recommended a sentence of reduce [sic] years less than a life sentence. We understood that you were very young, had very little choice and guidance in how you lived your life, and we're [sic] involved in the difficult to escape mechanisms of the drug trade. Mitigating circumstances certainly made us feel that an option besides life or death was worth evaluation. **I would hope that as the sentencing rules change, you may be considered for a change to your sentence**, based upon all the positive things you have done with your life, for others. I believe our penal system needs massive reform, including sentencing rules and guidelines. It is my hope for you that somehow you**{2023 U.S. Dist. LEXIS 20}** can be one of the people who gets consideration very soon.[Doc. No. 677] at 14 (emphasis added).

Given both the parties' and the Court's confusion and uncertainty around Count 2, the Court will consider the underlying doctrinal sentiments in ***Booker*** as a consideration, not a standalone justification, for whether extraordinary and compelling reasons exist to reduce Johnson's sentence. In that vein, the average federal sentence for murder is substantially less than life. [Doc. No. 699] at 27. In Fiscal Year 2021, the average sentence nationally for murder was 248 months, or just over 20 years. U.S.S.C., *2021 Federal Sentencing Statistics*, Table 4 (2021), https://www.ussc.gov/research/data-reports/geography/2021-federal-sentencing-statistics.

Nevertheless, Count 5 is still subject to a mandatory minimum sentence of life27 and the Government urges that even if the Court considers ***Booker***, "there is no basis to conclude that the court would not have imposed at least one life sentence under the advisory guidelines." [Doc. No. 704] at 21. But notwithstanding the existing statutory mandatory minimum for Count 5, Judge Lee's letter and the comments from the jury foreman makes clear that but for the sentencing and verdict obligations then**{2023 U.S. Dist. LEXIS 21}** imposed on them, which Congress has specifically permitted the Court to mitigate under 18 U.S.C. § 3582(c)(1)(A), Johnson would not have been sentenced to life.28

**D. Sentencing Disparities**

"A sentencing **disparity** may, in limited circumstances, constitute an extraordinary and compelling reason to reduce a sentence and grant **compassionate release**." *United States v. Eccleston*, 573 F. Supp. 3d 1013, 1017 (D. Md. 2021) (granting **compassionate release** after finding defendant "has demonstrated that the **disparity** between his sentence and those of his co-defendants constitutes an extraordinary and compelling reason for release"). *But see United States v. Arojojoye*, 806 F. App'x 475, 477-78 (7th Cir. 2020) (characterizing an argument with respect to sentencing **disparity** as "dubious" in a motion for **compassionate release**). Johnson urges the Court to consider the sentencing disparities between him and Damein, Rickey, and Brown. [Doc. No. 699] at 29.

Johnson, Damein, and Rickey were all charged under 18 U.S.C. § 1959(a)(1) (murder in aid of racketeering) in connection with the death of Bernard Franklin. Rickey was also charged under § 1959(a)(1) in connection with the murder of Shawn Thomas;29 and Johnson was also charged in connection with Villa's death under § 1959(a)(1) (Count 3) and 18 U.S.C. §§ 924(c) and 924(j) (Count 4).30

Damein pled guilty to his § 1959(a)(1) charge pertaining to the Franklin killing and received the **mandatory life{2023 U.S. Dist. LEXIS 22}** sentence, later reduced to 20 years pursuant to a Rule

DISHOT                                                                                          7

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

35 motion; he was released in 2015. [Doc. No. 543] at 1; [Doc. No. 547] at 1; [Doc. No. 699] at 30-31. Rickey pled guilty to both of his § 1959(a)(1) charges pertaining to the Franklin and Thomas killings and received two concurrent **mandatory life** sentences, later reduced to a total of 40 years pursuant to a Rule 35 Motion (in which the Government recommended a reduced sentence of between 25 and 30 years). [Doc. Nos. 550, 556]. Accordingly, after Damein and Rickey's sentence reductions, they both effectively received 20 years per § 1959(a)(1) conviction.

At trial, Johnson was convicted of voluntary manslaughter in connection with Villa's death in both Count 331 and Count 4, for which he received 70 months on Count 4 to be served consecutive to Count 2, with Count 3 dismissed by stipulation prior to sentencing. He was also convicted of aiding and abetting Franklin's murder under § 1959(a)(1) (Count 5), for which he received the **mandatory life** sentence, notwithstanding that the jury determined that Johnson's participation in the death was not premeditated, that Johnson did not make a payment or promise of pecuniary value to Brown for Villa's murder, and that Johnson's role was "relatively{**2023 U.S. Dist. LEXIS 23**} minor." [Doc. No. 699-15] at 3, 7.

Brown, who shot and killed Villa, appears not to have been charged at all with Villa's murder and received a total sentence of 60 months on potentially different offenses in New York.32

There clearly exists sentencing disparities as between Johnson on the one hand and Damien, Ricky and Brown on the other. The Government contends, however, that these disparities are not "unwarranted" in light of the cooperation that Damien, Rickey and Brown provided and that the more appropriate comparator is Johnson's twin brother Raheem, who received eight life sentences plus 528 months. [Doc. No. 704] at 26.33 But Raheem was convicted of, *inter alia*, four counts of murder in aid of racketeering, one count of second-degree murder in aid of racketeering, three counts of murder using a firearm during a drug-trafficking offense, and one count of seconddegree murder using a firearm during a drug-trafficking offense. *Id.* By contrast, in relation to the deaths charged in the prosecution of the conspiracy, Johnson was convicted and sentenced for only one count of aiding and abetting murder in aid of racketeering and one count of voluntary manslaughter.{**2023 U.S. Dist. LEXIS 24**} Thus, Raheem is not an appropriate comparator.

The Court recognizes that as the leader of this criminal enterprise, along with his twin brother, Johnson had greater overall culpability than co-conspirators Rickey, Damein, or Brown. But without diminishing the extremely serious nature of Johnson's conduct that led to the deaths of Franklin and Villa, in both cases the jury clearly found mitigating circumstances, as reflected in its verdict and findings,34 and Johnson was never specifically charged in connection with Thomas' death, as was Ricky, or with the deaths of Stevens or Morgan.35

On balance, there are sentencing disparities that weigh in favor of granting relief. Damein and Rickey ultimately received 20 and 40 years, respectively, after pleading guilty to one and two § 1959(a)(1) murders, respectively. By contrast, Johnson was convicted of one § 1959(a)(1) murder and sentenced to life, notwithstanding that the jury found mitigating circumstances and that his participation was minor. There also exists an even greater unwarranted sentencing **disparity** between Johnson and Brown, given Brown's five year sentence (which was potentially not related to the underlying conduct in this case whatsoever){**2023 U.S. Dist. LEXIS 25**} and the jury's findings that (1) Johnson did not substantially plan or premeditate Villa's killing, or procure payment to Brown for it, (2) Brown was the person that actually killed Villa, and (3) Johnson was found guilty of aiding and abetting.

### E. Stacked § 924(c) Convictions

After Johnson's convictions, Congress amended 18 U.S.C. § 924(c)'s stacking provision, specifying it

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

only applied after a predicate conviction became final. *United States v. Jordan*, 952 F.3d 160, 171 (4th Cir. 2020) (noting the First Step Act changed § 924(c)'s enhancements to "no longer appl[y] to multiple § 924(c) convictions obtained in a single prosecution"). Johnson was convicted under § 924(c) in Count 4, and then three subsequent convictions under § 924(c) in Counts 14, 16, and 17. At the time of his conviction, § 924(c) imposed a mandatory 20 years imprisonment for every subsequent offense, and such sentence was required to run consecutively. Therefore, for his convictions in Counts 14, 16, and 17, Johnson was sentenced to 240 months on each count to run consecutive to Count 2 - *i.e.*, 720 months. Because Johnson's first § 924(c) conviction on Count 4 was not final prior to his convictions on Counts 14, 16, and 17, if sentenced today, Johnson would face a mandatory minimum of five years (60 months) for each of those three counts, or{**2023 U.S. Dist. LEXIS 26**} a total of fifteen years (180 months), to run consecutive to Count 2, in addition to the five year mandatory minimum for Count 4.36

The Government argues that, as *McCoy* recognized, the First Step Act was not intended to resentence all defendants who were convicted under § 924(c). *McCoy*, 921 F.3d at 287. Rather, an individual, case-by-case assessment is required, and based on that assessment, the Government asserts a reduction in sentence is not warranted here. Principally, the Government distinguishes between Johnson's conduct and the conduct of the defendants in *McCoy*, noting that no death resulted from the conduct in those cases and that this case presents different circumstances given that in *McCoy*, unlike here, the § 924(c) sentences constituted the "lion's share" of the sentences, whereas here Johnson also received two life sentences. [Doc. No. 704] at 28 (quoting *McCoy*, 921 F.3d at 278). But as this Court, Judge Ellis presiding, has found, that a defendant's underlying sentence is life does not preclude a sentence reduction on account of § 924(c) changes. *United States v. Stoddard*, No. 1:14-cr-76, 2021 U.S. Dist. LEXIS 109149, 2021 WL 2379568, at *4 (E.D. Va. June 9, 2021).

Johnson's sentences on Counts 14, 16, and 17 were four times higher than what Congress now deems adequate punishment for multiple § 924(c) convictions arising out of the same prosecution. This Court, the undersigned{**2023 U.S. Dist. LEXIS 27**} presiding, previously granted **compassionate release** where a defendant was convicted of three § 924(c) offenses under the same sentencing regime that Johnson was sentenced under. *Redd*, 444 F. Supp. 3d at 718. The defendant in *Redd* was sentenced to a mandatory 540 months (60 months for first offense and 240 months for each of the two subsequent convictions). *Id.* As the Court then noted, that resulted in a sentence "30 years, or three times longer, than what Congress has now deemed an adequate punishment for comparable § 924(c) conduct." *Id.* at 723. Here, Johnson was sentenced to more than 65 years (790 months) on Counts 4, 14, 16, and 17, whereas today he would only face a mandatory minimum of 20 years (240 months).37 In other words, the changes to § 924(c) potentially account for an additional term of 45 years (540 months) imposed on Johnson than would be required today. Accordingly, notwithstanding the seriousness of Johnson's underlying offenses, the massive **disparity** resulting from the statutory changes to § 924(c) present an extraordinary and compelling reason in this case.

### F. Plain Error in Jury Instructions Regarding Continuing Criminal Enterprise

On direct appeal of his conviction, Johnson challenged, *inter alia*, the jury instructions on Count 2. *United States v. Johnson*, 219 F.3d 349, 352-53 (4th Cir. 2000). Specifically, the jury instructions did not require the jury to find *unanimously* that three or more violations of federal narcotics laws occurred. *Id.* at 353. At the time the instructions were given, Fourth Circuit precedent did not require the jury to find unanimously that each violation that comprised the series of violations occurred. *Id.* Subsequently, the Supreme Court in Richardson v. United States, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999), so found. Accordingly, on appeal the Fourth Circuit determined the district

DISHOT                                                                 9

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

court's failure to instruct as to the need to unanimously find each violation amounted to plain error; nonetheless, the court was "satisfied that this is not a case in which we should exercise our discretion to correct the error." *Id.* at 353-54.

Johnson claims that{**2023 U.S. Dist. LEXIS 29**} because "there is no way of knowing whether the jury unanimously found each violation underlying the [continuing criminal enterprise] count," the Court "is free to consider it when assessing whether there are extraordinary and compelling reasons for a reduction in sentence." [Doc. No. 699] at 35-36. The Government contends that this amounts to a collateral attack on Johnson's conviction on Count 2, which it claims is not permitted in a **compassionate release** motion. *See* [Doc. No. 704] at 29-38.

Ultimately, the Court need not, and will not, determine whether to consider the plain error in the jury instructions because, even if it were able to, it is unpersuasive and does not bear on whether extraordinary and compelling circumstances exist to justify relief. The Fourth Circuit's reasoning on this exact issue in this exact case is persuasive and binding. The plain error in the jury instructions does not support relief.

### G. Lack of § 924(c) Predicate Offenses

When Johnson was convicted, the Fourth Circuit was in the minority of federal courts of appeals that permitted multiple § 924(c) convictions to be premised on a single predicate offense. *United States v. Jackson*, No. 3:90-cr-85, 2021 U.S. Dist. LEXIS 103083, 2021 WL 2226488, at *2 (W.D.N.C. June 2, 2021). In 1999, following Johnson's conviction, the Assistant Attorney General{**2023 U.S. Dist. LEXIS 30**} of the United States Department of Justice ("DOJ") instructed all United States Attorneys to follow the approach of the majority of federal appellate courts in requiring each § 924(c) charge to be based on a separate predicate offense. *Id.* As discussed below, if this guidance had been in effect and applied to Johnson, two of his four § 924(c) convictions would likely not have been charged.

<u>i. Counts 4 and 14</u>

Count 4 was predicated on Count 1, and Count 14 was predicated on Count 2. [Doc. No. 699] at 37 & n.25. However, Count 1 was later vacated as a lesser-included offense of Count 2, meaning the § 924(c) charges in Counts 4 and 14 were effectively both predicated on the offense conduct arising in Count 2. *Id.* Accordingly, only one of those § 924(c) Counts would have been charged.

<u>ii. Counts 16 and 17</u>

The § 924(c) charge in Count 16 clearly relates to the underlying conduct charged in Count 15. Specifically, Count 15 charges Johnson for distributing 50 grams or more of a substance containing cocaine base on August 1, 1996, and Count 16 charges Johnson for carrying a firearm while distributing 50 grams or more of cocaine base on the same date. [Doc. No. 699-16] at 35-36.

Based on the second superseding indictment, it appears that{**2023 U.S. Dist. LEXIS 31**} Count 17 is connected to the same predicate offense. Specifically, Count 17 charges:

> On or about August 1, 1996, in Arlington County, Virginia, within the Eastern District of Virginia, defendant SHAHEEM JOHNSON did unlawfully and knowingly aid and abet Troy Edmonds in the carrying of a Taurus 9mm semi-automatic pistol during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit: possession with intent to distribute cocaine and cocaine base, Schedule II narcotic controlled substances, a violation of Title 21, United States Code, Section 841(a)(1).

> (In violation of Title 18, United States Code, Sections 924(c)(1) & 2)*Id.* at 37. The only possible other remaining charge that could serve as a separate predicate to Count 17 is Count 19, which

DISHOT                                                    **10**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

charges:

On or about August 2, 1996, in Arlington County, Virginia, within the Eastern District of Virginia, defendant SHAHEEM JOHNSON did unlawfully, knowingly and intentionally possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine HCl, a Schedule II narcotic controlled substance.

(In violation of Title 21, United States Code, Section 841(a)(1))*Id.* at 39. As charged in the SSI, the conduct alleged in Count 19 is unlikely the predicate offense{**2023 U.S. Dist. LEXIS 32}** to Count 17. Count 17 lists an August 1, 1996 offense date, is more likely based on offense conduct outlined in Count 15 bearing the same date, and describes the underlying offense as "possession with intent to distribute cocaine and cocaine base, Schedule II narcotic controlled substances." Count 19 lists an August 2, 1996 offense date and describes materially different conduct than described in Count 17, viz., "possess[ion] with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine HCl, a Schedule II narcotic controlled substance."

### iii. Application Today and Relevance to Proceeding

For the foregoing reasons, the United States today would have likely only charged either (a) Count 4 *or* Count 14, and (b) Count 16 *or* Count 17. Therefore, Johnson would have only faced two § 924(c) charges, resulting in, under today's law, two five-year mandatory minimum sentences to run consecutive to any other term of imprisonment. However, the Government contends that this issue, whatever its merit, amounts to a collateral attack not properly suited for a **compassionate release** motion. In support of that position, the Government cites, *inter alia,* a prior{**2023 U.S. Dist. LEXIS 33}** decision by this Court, Judge Payne presiding. In *United States v. Ferguson,* the Court held:

> The **compassionate release** statute allows the court to consider extraordinary and compelling reasons warranting **compassionate release**, but it does not replace the established mechanism for challenging the validity of a sentence. Nor does it allow the defendant to make arguments that were, or could have been, raised in direct appeal or collateral review.No. 3:04-cr-13, 2021 U.S. Dist. LEXIS 83355, 2021 WL 1701918, at *4 (E.D. Va. Apr. 29, 2021). And the Fourth Circuit affirmed *Ferguson,* holding "[b]ecause § 2255 is the exclusive method of collaterally attacking a federal conviction or sentence, a criminal defendant is foreclosed from the use of another mechanism, such as **compassionate release**, to sidestep § 2255's requirements." *United States v. Ferguson,* 55 F.4th 262, 270 (4th Cir. 2022). But the challenges to the convictions in *Ferguson* were based on subsequent Supreme Court precedent or Fifth and Sixth Amendment rights. *Ferguson,* 2021 U.S. Dist. LEXIS 83355, 2021 WL 1701918, at *4. By contrast, Johnson's position is based on a policy change implemented by the DOJ that is nonbinding on this Court.

Accordingly, the issue Johnson presents is best considered not as an attack on his conviction, but rather as an argument that there exists an extraordinary and compelling reason given that under similar circumstances, today he would likely{**2023 U.S. Dist. LEXIS 34}** face two fewer § 924(c) charges. This change yields a massive **disparity** between Johnson's sentence and that of a defendant sentenced today-a **disparity** reinforced by the substantial disparities between Johnson's sentence and the sentences of certain co-conspirators. And while not alone sufficient to warrant relief, the Court finds this argument to be a relevant consideration that weighs in favor of reducing Johnson's § 924(c)-related convictions.

### H. Resentencing of Count 2 as a "Covered Offense" under the First Step Act

Johnson contends that Count 2 is a "covered offense" under the Sec. 404 of the First Step Act, which

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

would allow the Court to resentence him.38 [Doc. No. 699] at 38. However, Johnson's Motion is made pursuant to 18 U.S.C. § 3582(c)(1)(A), *id.* at 1, and the Fourth Circuit has expressly held that "§ 3582(c)(1)(B) is the appropriate vehicle for a First Step Act motion." *United States v. Wirsing*, 943 F.3d 175, 183 (4th Cir. 2019). Johnson has conceded that his Motion is not the appropriate avenue for seeking relief under § 404 of the First Step Act, but nevertheless requests "for the sake of judicial economy" that "the Court [] consider that claim as contributing toward an already extraordinary and compelling case for release." [Doc. No. 706] at 12.

This Court, Judge Novak presiding, previously confronted a similar issue. In *United States v. Dodson*{2023 U.S. Dist. LEXIS 35}, the defendant filed a motion for **compassionate release** based on changes to the guidelines range. No. 3:02-cr-257, 2020 U.S. Dist. LEXIS 201558, 2020 WL 6323721, at *5 (E.D. Va. Oct. 28, 2020). The Court determined that the defendant's motion would have been more appropriately made under Sec. 404 of the First Step Act, and that while it would still "consider the guideline reduction in the overall § 3553(a) analysis, th[e] **compassionate release** motion does not provide the Court with the appropriate vehicle to entertain [Sec. 404] relief on an independent basis." *Id.* Here, it appears that Johnson attempts to use Section 404 as justification for the Court to resentence him on Count 2, presumably in the event that the Court declines to exercise § 3582(c)(1)(A) authority to reduce that sentence.

Count 15 is more clearly impacted by Sections 2 and 3 of the Fair Sentencing Act, not Count 2. And Johnson has already completed his sentence on Count 15, which was 120 months to run concurrent with Count 2. Therefore, there is no need for Johnson to receive relief as to Count 15 and this argument is advanced for the purpose of seeking relief as to Count 2. But because the Fourth Circuit has held that § 3582(c)(1)(A) is an inappropriate vehicle for First Step Act Section 404 relief, the Court will decline to resentence Johnson on Count 2 *on that basis*.

### I. Totality of the Extraordinary and Compelling Reasons Asserted

In summary,{2023 U.S. Dist. LEXIS 36} there are extraordinary and compelling reasons that warrant a sentence reduction and a concomitant consideration of the § 3553(a) factors. Johnson's rehabilitation has been remarkable, having aggressively pursued for himself educational and other programming as well as providing leadership and mentorship to other inmates. Johnson was relatively young at the time of his offenses, and his offenses should be at least partially viewed within the context of the horrific childhood he endured. ***Booker***, to the extent applicable, counsels in strong favor of a reduction in sentence on Count 2, particularly in light of the letters from Judge Lee and the jury foreman, both of whom sat through the trial and heard all of the evidence.39 Sentencing disparities exist between Johnson as compared to Rickey, Damein, and particularly Brown. The § 924(c) stacking that resulted in a combined 60 years on Counts 14, 16, and 17 to be served consecutive to Count 2 has been eliminated under the First Step Act and today, Johnson would face a mandatory minimum of 15 years (180 months) on those three counts instead of the 60 years (720 months) he did at sentencing-a 75 percent reduction. Moreover, under DOJ policy, Johnson today would{2023 U.S. Dist. LEXIS 37} have likely been convicted and sentenced for only two, not four, § 924(c) charges, thereby reducing his consecutive sentence by 40 years (480 months) on that basis alone. Accordingly, the Court finds that extraordinary and compelling reasons exist to justify a sentence reduction and will proceed to the § 3553(a) analysis.

### IV. ANALYSIS - § 3553(a) FACTORS

Having determined that extraordinary and compelling reasons support a sentence reduction, the Court must "next examine[] whether the sentencing factors under 18 U.S.C. § 3553(a) also support early release." *Eccleston*, 573 F. Supp. 3d at 1019. In relevant part, § 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary," and in doing so it should consider,

DISHOT

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant"; how the sentence will reflect the seriousness of the offense, promote respect for the law, deter other criminal conduct, and protect the public; and "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a).

As an initial matter, with respect to the sentences Johnson is currently serving or has yet to serve (*i.e.*, his life and consecutive sentences), Johnson was sentenced to either the mandatory minimum sentence or the minimum **{2023 U.S. Dist. LEXIS 38}** guideline sentence on every count.40 Accordingly, given these sentences were the mandatory minimum required by statute or the guidelines, Judge Lee had no meaningful opportunity to evaluate and apply the § 3553(a) factors in determining an appropriate sentence. Accordingly, Johnson's case, as now before the Court pursuant to 18 U.S.C. § 3582(c)(1)(A), provides the first opportunity to comprehensively consider the § 3553(a) factors without being completely restrained by any mandatory statutory or guideline provisions. And while the Government centrally contends that no reduction is appropriate in light of the still applicable **mandatory life** sentence on Count 5, Congress did not exempt **mandatory life** sentences from (a) relief under the original language in § 3582(c)(1)(A)(i) or (b) the modifications to the exhaustion requirements of § 3582(c)(1)(A). Likewise, as far as the Court can determine, no federal appeals court, and certainly not the Fourth Circuit, has limited **compassionate release** relief to cases where there is no **mandatory life** sentence. And in evaluating the § 3553(a) factors, the Court is to consider "the most up-to-date picture" of Johnson–*i.e.*, how he appears at the time of resentencing-not as Johnson was when he was sentenced a quarter-century ago. *Pepper v. United States*, 562 U.S. 476, 492, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011) (citing **{2023 U.S. Dist. LEXIS 39}** *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (per curiam) ("[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing")).

## A. § 3553(a)(1)

With respect to the "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as Johnson himself acknowledges, his crimes "were heinous and warranted a substantial sentence of imprisonment." [Doc. No. 699] at 46. He was a leader in a five-year, extensive and violent illegal narcotics enterprise operating across five jurisdictions. It is also undisputed that as a young child Johnson experienced a horrific upbringing that no doubt played a significant role in landing him in prison. That he had such a traumatic upbringing, yet by all accounts has still matured and turned his life around so significantly in prison while facing two life sentences without the possibility of parole, is particularly noteworthy.41 And while Johnson did proceed to trial, he accepted responsibility for his actions immediately thereafter, stating:

> I sold drugs, that's what I did. And along the way, I either, directly or indirectly, set the atmosphere for many people to get hurt and to lose their lives . . . . [A]nd although I never actually sat **{2023 U.S. Dist. LEXIS 40}** down and contemplated the taking of a life, I nonetheless, by my participation in the selling of drugs, was condoning everything that came along with it . . . . I do feel responsible for the actions of the others.[Doc. No. 699-19] at 2-3.

Johnson also spoke at length at the March 29, 2023 hearing about his culpability and responsibility for the harm that flowed from the criminal enterprise he led. He credibly expressed genuine remorse for his actions and the destruction that followed and took full responsibility for it. As to Johnson's characteristics in prison, beyond Johnson's substantial rehabilitation as previously described, his daughter testified at the hearing about how he has been a supportive and loving father and grandfather in prison, calling every morning. According to Johnson, his daughter has inspired him to surround himself with positive people, and if released he plans to work for an electrical company and

DISHOT                                                        13

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

youth initiative, publish a book he is writing to deter others from engaging in criminal activity, and ask his longtime partner and mother of his daughter to marry him. The Court is also in receipt of other letters attesting to Johnson's changed character and **{2023 U.S. Dist. LEXIS 41}** redeeming qualities. While none of this begins to excuse Johnson's prior conduct, it does speak to who Johnson is today as he now appears before the Court.

Ultimately, Johnson, now in his fifties, has served more than a quarter-century in prison - more than half his life. Without diminishing or minimizing Johnson's crimes and the impacts they had and continue to have on the victims and their families, Johnson's age at the time of his offense conduct, the environment in which he lived since he was a young child, and his transformation and maturity over the last twenty five years while in prison, on balance, weigh in favor of relief. At the heart of the First Step Act is the view that individual considerations should guide the decision as to when and if certain offenders deserve the chance to rejoin the community. Johnson has demonstrated that he falls into the category of persons who have earned that opportunity, notwithstanding his offense conduct.42

### B. § 3553(a)(2)

The second factor in the § 3553(a) analysis emphasizes:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate**{2023 U.S. Dist. LEXIS 42}** deterrence to criminal conduct . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.18 U.S.C. § 3553(a)(2). Johnson has served a quarter-century in prison. And while every case is different, courts within this Circuit and elsewhere have granted **compassionate release** motions for defendants serving life sentences for § 1959(a)(1) convictions and who, like Johnson, had already served more than two decades in prison.43 Overall, the sentence reduction that the Court awards, 35 years with 10 years of supervised release, constitutes a just punishment and would likely be viewed as such by both the sentencing judge, Judge Lee, and the jury who convicted Johnson, as reflected in the jury foreman's statement. [Doc. No. 699] at 51.44

[intentionally left blank]

### C. § 3553(a)(6)45

This factor examines "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As detailed, *supra*, a sentence of less than life in prison would roughly accord with the sentences ultimately handed down to Rickey and Damein (20 years per § 1959(a)(1) conviction). It is also relevant that Johnson has already served more time than Damein did for his § 1959(a)(1) conviction, and more time than the lower range (25 years) requested by the Government in its Rule 35(b) motion with respect to Rickey, who unlike Johnson, was convicted of *two* § 1959(a)(1) **mandatory life** charges. While cooperation surely warrants some benefit, in this case, the **disparity** between receiving**{2023 U.S. Dist. LEXIS 44}** 20 years per § 1959(a)(1) conviction and life is too great and substantially unwarranted. Additionally, life in prison far exceeds Brown's punishment (if he indeed received any) for carrying out Villa's killing.

### D. Balance of § 3553(a) Factors

On balance, these factors counsel in favor of a substantial sentence of years less than life in prison. Based on the facts and circumstances, extraordinary and compelling reasons exist to justify a

DISHOT

14

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

sentence reduction, which is further supported upon consideration of the § 3553(a) factors. Accordingly, the Court will reduce Johnson's sentence to a total period of incarceration of 420 months, or 35 years, with credit for time served and before application of any good time or other credits. This sentence reduction represents a reduction on Count 2 to 20 years; a reduction on Count 5 to 20 years to be served concurrently with Count 2; and reductions of the § 924(c) charges in Counts 4 and 16 to seven and a half years (90 months) each, to run consecutively to Count 2 and each other, with no time imposed with respect to the § 924(c) charges in Counts 14 and 17, and no changes to the remaining counts. Johnson's sentence will also be modified to include a term of 10 years of supervised release.

**V.{2023 U.S. Dist. LEXIS 45} CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the Motion, [Doc. No. 676], be, and hereby is, GRANTED IN PART insofar as Johnson's sentence is reduced to a term of imprisonment of 420 months, with credit for time served and before application of any good time or other credits, and is otherwise denied; and it is further

**ORDERED** that Johnson's term of supervised release be, and hereby is, MODIFIED to a term of 10 years with the same conditions previously imposed.

The Clerk is directed to forward a copy of this Memorandum Opinion & Order to all counsel of record and the Director of the Bureau of Prisons.

Alexandria, Virginia

August 8, 2023

/s/ Anthony J. Trenga

Anthony J. Trenga

Senior U.S. District Judge

**Footnotes**

1

The Motion was originally filed *pro se*. The Office of the Federal Public Defender ("OFPD") has since been appointed to represent Johnson, and OFPD has filed a supplemental brief on his behalf, [Doc. No. 699].

2

All page citations refer to the page number at the bottom of the cited document, not the page number associated with the CM/ECF file stamp at the top of the page.

3

Count 1 was later vacated as a lesser-included offense to Count 2, and Count 3 was later dismissed pursuant to a stipulation at sentencing. [Doc. No. 704] at 6. Table 1 excludes those two convictions.

4

As discussed, *infra*, both the Court and the parties have been unable to discern whether Johnson was convicted and sentenced under 21 U.S.C. § 848(a) or (b). The former included a mandatory minimum of twenty years and guideline sentence of 292-365 months, whereas the latter included a **mandatory life** sentence.

DISHOT                                                          15

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

5

While the Amended Judgment, [Doc. No. 500], lists Count 4 as a violation of "Title & Section . . . 18:13-0300.F," both the PSR and the Government's Motion to Correct Sentence, [Doc. No. 518], characterize Count 4 as being a conviction under 18 U.S.C. § 924(c) & (j).

6

Johnson was originally sentenced to 60 months on Count 4. [Doc. No. 499] at 3. Subsequently, that judgment was amended to 70 months, [Doc. No. 500] at 3, based on the then-mandatory guidelines range of 70-87 months. [Doc. No. 518] at 2.

7

At the sentencing phase, the Government sought imposition of the death penalty. The jury instead recommended life imprisonment. [Doc. No. 704] at 6.

8

Defendant's brief, [Doc. No. 699] at 6, states Count 13 was to run consecutive to Count 2. However, the amended judgment, [Doc. 500] at 3, commands the term to run concurrently to Count 2.

9

For Count 13, Johnson's adjusted offense level was 28. PSR at p. 43. Using the 1998 sentencing table and a criminal history category of 3, *id.* at p. 49, the guideline range was 97-121 months and the sentence of 240 months was above the then mandatory guidelines. However, the issue is now moot given the sentence ran concurrently to Count 2 and therefore has already been served.

10

For Count 18, Johnson's adjusted offense level was 24. *Id.* at p. 47. Using the 1998 sentencing table and a criminal history category of 3, *id.* at p. 49, the guideline range was 63-78 months and the sentence of 120 months was above the then mandatory guidelines. However, the issue is now moot given the sentence ran concurrently to Count 2 and therefore has already been served.

11

All references are to the Second Superseding Indictment ("SSI"), [Doc. No. 699-16].

12

Specifically, an addendum to the PSR states as follows:

The defendant was convicted in the conspiracy count, and the murders [of Tracey Morgan, Shawn Thomas, and Antonio Stevens] are specific overt acts mentioned in the Indictment. The defendant is accountable for any reasonably foreseeable and jointly undertaken activity.PSR Addendum at 2.

13

The SSI alleges that the Johnson twins "procured" Brown to kill Villa and that the murder was "as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from th[e] enterprise." [Doc. No. 699-16] at 16, 23. However, the jury found that Johnson (1) did not cause Villa's death "after substantial planning and premeditation," (2) did not "in committing the offense and in furtherance of the criminal enterprise of which the offense was a part, use[] a firearm and knowingly direct[], advise[], authorize[], and assist[] others to use firearms" or (3) "procure[] [Villa's death] by payment and promise of payment of something of pecuniary value." [Doc. No. 699-15].

14

Specifically, the SSI only implicates Raheem Johnson and Shawn Thomas in Antonio Stevens' death. [Doc. No. 699-16] at 10.

DISHOT                                        **16**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

15

The PSR characterizes the circumstances of Morgan's murder as her being "at the wrong place, at the wrong time." PSR ¶ 57.

16

To the extent Johnson's *pro se* Motion offers any additional arguments not advanced by OFPD, the Court finds those arguments unpersuasive.

17

Because Johnson is not 70 years old, § 3582(c)(1)(A)(ii) does not apply.

18

The Government does not appear to contest that Johnson has satisfied the exhaustion requirement and that this Court has jurisdiction to consider the Motion. However, the Government does contend that three grounds on which Johnson seeks **compassionate release** are improper reasons upon which to grant relief. [Doc. No. 704] at 29 (arguing that because Congress has provided other methods to seek relief, arguments related to the plain error in jury instructions, lack of predicate for two of the § 924(c) convictions, and purported eligibility for resentencing under Count 2 are not cognizable at this stage). The Court addresses those arguments below.

19

The Government urges a stricter rule - that the Court cannot consider rehabilitation until it finds an independent extraordinary and compelling reason justifying relief. [Doc. No. 704] at 14-15 (citing *United States v. Thomas*, 857 F. App'x 239, 243 (7th Cir. 2021)). The Court declines to adopt such a hard-and-fast rule in light of the Fourth Circuit's commentary in *McCoy* and absence of any suggestion that rehabilitation is appropriately considered not under § 3582(c)(1)(A)(i), but only after a finding of an extraordinary and compelling reason and in connection with the § 3553(a) analysis that follows such a finding.

20

While this argument is advanced in OFPD's supplemental brief, Johnson notably stated at the hearing that he did not offer his traumatic childhood as an excuse for his actions.

21

To be sure, Johnson was unquestionably more culpable and his conduct more severe than the defendant in *Scruggs*. Nevertheless, *Scruggs* stands for the proposition that this Court has found ***Booker*** to be a relevant factor in evaluating **compassionate release** motions.

22

This Court, the undersigned presiding, previously granted a motion for **compassionate release** after "centrally consider[ing] the sentence [defendant] received relative to the sentence he would now receive for the same offense." *United States v. Redd*, 444 F. Supp. 3d 717, 722-23 (E.D. Va. 2020). While the basis for that sentence reduction was largely the stacking changes to § 924(c) made in the First Step Act, the Court did note that ***Booker*** also changed the possible sentence he could have received for the robberies. *Id.* at 723.

23

Notably, Counts 4, 14, 16, and 17 all run consecutive to Count 2. Seventy months was imposed under Count 4, and 240 months was imposed under each of Counts 14, 16, and 17.

24

The verdict form simply has "Guilty" handwritten in a space next to "Continuing Criminal Enterprise, Count 2." [Doc. No. 408] at 1.

DISHOT                                                                    17

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25

Separately, Johnson was resentenced on Count 4 shortly after the judgment was originally imposed. In the amended judgment, Johnson was sentenced to an additional ten months, from sixty to seventy months, because the applicable guideline range was 70-87 months. [Doc. No. 518] at 2. Therefore, under a post-***Booker*** framework, Johnson would have only been subject to the mandatory minimum of 60 months, not the minimum guideline range of 70 months.

26

This was the second letter the jury foreman wrote to Johnson. The foreman previously initiated contact with Johnson, writing, *inter alia*, that had he been able to, he "would have voted for a parole review letter." [Doc. No. 677] at 13.

27

While the plain language of 18 U.S.C. § 1959(a)(1) suggests that a fine only might be permitted as an alternative to a life sentence, the Fourth Circuit, like other courts, has rejected that interpretation, determining it "cannot have been what Congress intended," and instead found the statute requires either death or life. *United States v. Under Seal*, 819 F.3d 715, 720 n.5 (4th Cir. 2016).

28

The Government did not have the benefit of Judge Lee's letter at the time it filed its opposition. At the hearing, the Government deferred to the Court as to the extent to which the Court should consider it.

29

Rickey pled to two § 1959(a)(1) charges, one by criminal information and one by indictment. [Doc. No. 233] at 1-2.

30

All three were also charged with conspiracy to commit money laundering (Count 13 for Johnson), as to which Damien and Ricky plead guilty and Johnson was convicted. All three received sentences of 240 months, to run concurrently with their other sentences that have now been served. *See* [Doc. No. 173] at 1-2; [Doc. No. 233] at 1-2.

31

Johnson was charged under § 1959(a)(1) in Count 3 but was found guilty of the lesser included offense of voluntary manslaughter.

32

Brown, who was not prosecuted in the Eastern District of Virginia but rather in New York, pled guilty to two counts of racketeering murder-for-hire under 18 U.S.C. § 1958, three counts of using a firearm during a crime of violence under 18 U.S.C. § 924(c), two counts of interference with commerce by threat or violence under 18 U.S.C. § 1951, and one count of false statements under 18 U.S.C. § 1001. *Id.* at 31. He testified against the Johnsons, was sentenced to 60 months on each count, all to be served concurrently, and released in 2003. Among Brown's eight convictions were three convictions under § 924(c). *See United States v. Brown*, No. 1:97-cr-1271, (S.D.N.Y.), [Doc. No. 7]. Inexplicably, while the statute, as interpreted by the Second Circuit at the time, imposed a five-year mandatory minimum for each count and required those convictions to run consecutively, they were ordered to run concurrently. And notably, had Brown been sentenced on his § 924(c) charges in the same manner as Johnson, two of those charges would have been considered subsequent offenses, resulting in a total sentence of forty-five years on those three § 924(c) charges alone. At the hearing, the Government was unable to provide any justification or explanation for Brown's extraordinarily lenient sentence besides the fact that he cooperated. The Government also argues that because it

DISHOT                                                    **18**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

appears Brown's convictions in New York do not relate to Villa's murder, it is unclear whether Brown even qualifies as a similarly situated co-defendant. [Doc. No. 704] at 23, 26 ("Brown pleaded guilty in a different jurisdiction to different crimes"). But were Brown never charged in connection with Villa's murder the sentencing **disparity** between him (*i.e.*, no sentence) and Johnson would appear even more unwarranted.
33

The Government also contends that these disparities were known to the Court when Johnson was sentenced. While surely the Court knew of Damein, Rickey, and Brown's cooperation at Johnson's sentencing, the disparate sentences all arose after Johnson's sentences, as Johnson was sentenced on March 26, 1999. [Doc. No. 499]. Damein's sentence was reduced on July 28, 2000, [Doc. No. 547]; Rickey's sentenced was reduced on September 15, 2000, [Doc. Nos. 556, 561]; and Brown was sentenced on March 8, 2000, *United States v. Brown*, No. 1:97-cr-1271 (S.D.N.Y.), [Doc. Nos. 7, 8].
34

In the jury's special verdict form regarding Villa's death, ten of twelve jurors found that "the defendant's participation was relatively minor" and all twelve jurors found that "Richard Villa consented to the criminal conduct that resulted in [his] death." [Doc. No. 699-15] at 7.
35

As previously noted, Johnson was not specifically charged with respect to the Stevens, Thomas, or Morgan murders, but was alleged to have ordered the Thomas murder in Count 1 of the second superseding indictment.
36

Based on the then-mandatory guidelines, Johnson was sentenced to 70 months on Count 4, not the mandatory minimum of 60 months. [Doc. No. 500] at 3.
37

An amendment to Section 1B1.13 of the sentencing guidelines, effective November 1, 2023, is particularly relevant. In evaluating what constitutes an extraordinary and compelling reason, the sentencing commission has added "unusually long sentence," which states as follows:

*Unusually Long Sentence.*-If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law . . . may be considered in**{2023 U.S. Dist. LEXIS 28}** determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross **disparity** between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.U.S. Sentencing Commission, Amendments to the Sentencing Guidelines, p.2, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_A mendments.pdf (last accessed Aug. 4, 2023).
38

By way of background, to qualify as a "covered offense" under the First Step Act, the offense must constitute "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010." First Step Act, Pub. L. No. 115-391, § 404(a), 132 Stat. 5194 (2018). Johnson contends that because Count 2 has "at least one penalty attached to it that was modified by Section 2 or 3 of the Fair Sentencing Act, it therefore qualifies" notwithstanding the fact that 21 U.S.C. § 848, the charge in Count 2, itself was not modified by Section 2 or 3 of the Fair Sentencing Act. [Doc. No. 699] at 43. The Government largely focuses its arguments on the impropriety of a Sec. 404 argument in a § 3582(c)(1)(A) motion, though it "does not concede" that

DISHOT

**19**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Count 2 is otherwise a covered offense.

39

The Court's determination that Johnson has demonstrated extraordinary and compelling reasons exist would stand even if Johnson was convicted under § 848(b), thereby rending ***Booker*** meaningless with respect to Count 2.

40

Notwithstanding the uncertainty regarding Count 2.

41

Johnson has had several citations in prison, many of which were early on in his sentence and related to using illegal substances in prison to purportedly deal with depression. *Id.* at 47. Johnson's last infractions were a decade ago for possessing a dangerous weapon and assaulting another inmate by hitting him with a broom. [Doc. No. 699-5] at 8. According to Johnson, the weapons charge related to knives found in a light fixture in a cell that Johnson shared with another inmate. [Doc. No. 699] at 47. Special tools were needed to remove the light fixture to access the knives, which Johnson did not have. Johnson maintains that the weapons were not his, and that he only admitted to the infraction because he "felt coerced by prison personnel, who said Mr. Johnson could be physically assaulted if he allowed his cellmate to take the charge." [Doc. No. 699] at 47-48. As to the broom incident, Johnson claims the inmate he struck was going to stab another inmate, and so he struck the inmate with the broom to stop the more serious attack. *Id.* at 48. While the Court has no way to conclusively evaluate Johnson's explanations, they appear plausible and are made more credible by the fact that he has had no citations in the past decade.

42

The Government cites several cases, including from this Court, for the proposition that a defendant's conviction for drug-related murders are simply too serious and require such substantial punishment that **compassionate release** is not warranted. [Doc. No. 704] at 41 (citing *Brown v. United States*, No. 2:98-cr-47, 2021 U.S. Dist. LEXIS 142967, 2021 WL 3272203 (E.D. Va. July 30, 2021) and *Mosley v. United States*, No. 2:11-cr-58-3, 2021 U.S. Dist. LEXIS 109252, 2021 WL 2386120 (E.D. Va. June 10, 2021)). But *Brown* was a **compassionate release** motion based solely on COVID-19, and *Mosley* involved a 20-year sentence, not life in prison. The Government also cites *Butts v. United States*, No. 2:09-cr-2, 2021 U.S. Dist. LEXIS 51556, 2021 WL 1082480 (E.D. Va. Mar. 18, 2021), where this Court, Judge Jackson presiding, denied **compassionate release** to a defendant that "recruited multiple triggermen, provided them with weapons, and accompanied them to the shooting of three federal witnesses," two of whom were killed. In *Butts*, the defendant received two consecutive life sentences that had already been reduced to 396 months imprisonment. Thus, both the facts and posture of that case-*i.e.*, the defendant's life sentence had already been reduced-are materially different than this one. The Government also cites two other cases from this District where the Court, Judge Jackson likewise presiding in both, determined that the defendants' leadership in violent drug distribution enterprises weighed heavily against a reduction in sentence. [Doc. No. 704] at 42 (citing *Hirst v. United States*, No. 4:02-cr-134, 2021 U.S. Dist. LEXIS 123729, 2021 WL 2744531 (E.D. Va. July 1, 2021) and *Speed v. United States*, No. 2:00-cr-92, 2021 U.S. Dist. LEXIS 65202, 2021 WL 1240090 (E.D. Va. Apr. 2, 2021)). But the defendant in *Hirst* was not sentenced to life and thus had an opportunity for release, and the defendant in *Speed* seemed to only base his motion for **compassionate release** on COVID-19.

43

*See United States v. Morris*, No. 3:99-cr-264, 2022 U.S. Dist. LEXIS 153822, 2022 WL 3703201 (D. Conn. Aug. 26, 2022) (granting **compassionate release** and reducing sentence to 360 months for

DISHOT                                          **20**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

defendant who had served 23 years and was convicted under, *inter alia*, § 1959(a)(1) and sentenced to four life sentences); *United States v. Gray*, No. CCB-95-364, 2021 U.S. Dist. LEXIS 88855, 2021 WL 1856649 (D. Md. May 10, 2021) (granting **compassionate release** and reducing sentence to time served for defendant who had served 27 years and was convicted under, *inter alia*, § 1959(a)(1) and sentenced to life); *United States v. Perez*, No. 3:02-cr-7, 2021 U.S. Dist. LEXIS 41040, 2021 WL 837425 (D. Conn. Mar. 4, 2021) (granting **compassionate release** and reducing sentence to time served for defendant who had served 23 years and been convicted under, *inter alia*, § 1959(a)(1) and sentenced to three life sentences); *United States v. Rios*, No. 3:94-cr-112, 2020 U.S. Dist. LEXIS 230074, 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (granting **compassionate release** and reducing sentence to 360 months for defendant who had served 25 years and was convicted under, *inter alia*, § 1959(a)(1) and sentenced to three life sentences).

44

The Court has also considered the Government's argument at the hearing with respect to the special verdict form for Count 5, where eleven of twelve jurors found as to the fifth mitigating factor that:

> Shaheem Johnson will not represent a continuing threat to society if he is sentenced to life imprisonment without the possibility of release. He has adjusted well to incarceration and will not be a threat if sent to prison for the rest of his life.[Doc. No. 699-15] at 7-8. But to read that finding as justification for denying relief, as the Government does, ignores the context in which it was made and for what purpose. In that regard, the jury only had two choices: life or death. To justify a life sentence, the jury voted on the fifth mitigating factor *as presented to them* in the special verdict form. In other words, there was no opportunity for the jury to similarly find that Johnson would not represent a continuing threat to society if eventually released. Indeed, the jury foreman's statements about a desire to sentence Johnson to less than life suggest that at least some jury members would have so found. And relatedly, the jury unanimously found several redeeming qualities of Johnson that, in the absence of the jury's ability to expressly opine on its views regarding Johnson's possible release, arguably demonstrate that the jury would have been open to Johnson's possible future release, particularly following the type of significant rehabilitation that Johnson has demonstrated. Specifically, the jury unanimously found that:

> 6. Shaheem Johnson was exposed{**2023 U.S. Dist. LEXIS 43**} to significant negative family circumstances during critical stages of his life which rendered him vulnerable to influences which led him to criminal activity.

> ***

> 8. Shaheem Johnson is a father of children and is an active participant in their lives.

> 9. Shaheem Johnson's life has considerable value to members of his family and extended family.

> ***

> 11. Other factors in the defendant's childhood, background or character mitigate against imposition of a sentence of death.[Doc. No. 699-15] at 8.

45

The third, fourth, fifth, and seventh factors are, respectively, "the kinds of sentences available," "the kinds of sentence and sentencing range established" by the guidelines, "any pertinent policy statement . . . issued by the Sentencing Commission," and "the need to provide restitution to any victims of the offense." Neither party contends they are relevant and thus the Court will not consider them. *See United States v. Gaffney*, No. 1:95-cr-53, 2022 U.S. Dist. LEXIS 54404, 2022 WL 888350,

DISHOT

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

at *6 (E.D. Va. Mar. 25, 2022) (declining to consider § 3553(a) factors in a **compassionate release** motion that no party argued was relevant).

DISHOT                                        **22**

© 2023 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

ATTACHMENT THREE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 94-00194-12-CR-W-GAF |
| | ) | |
| KEVEN L WYRICK, | ) | |
| aka Kevin L Wyrick, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING *PRO SE* THIRD MOTION FOR COMPASSIONATE RELEASE

Now pending before the Court is defendant's *pro se* Third Motion for Compassionate Release (Doc. #1122). The Court having considered defendant's motion and considering all 18 U.S.C. § 3553 factors, including but not limited to the nature and circumstances of defendant's offense, his criminal history, the danger his release would present to the community, all relevant information in his pre-sentence report, the statutory and guideline range of punishment for his offense, together with the response of the Bureau of Prisons to the COVID-19 virus, defendant's request for Compassionate Release is DENIED.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 21, 2023

ATTACHMENT FOUR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 94-00194-12-CR-W-GAF |
| | ) | |
| KEVEN L. WYRICK, | ) | |
| a/k/a Kevin L. Wyrick, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING *PRO SE* MOTION FOR COMPASSIONATE RELEASE

Now pending before the Court is defendant's *pro se* Motion for Compassionate Release (Doc. #1110). The Court having considered defendant's motion and considering all 18 U.S.C. § 3553 factors, including but not limited to the nature and circumstances of defendant's offense, his criminal history, the danger his release would present to the community, all relevant information in his pre-sentence report, the statutory and guideline range of punishment for his offense, together with the response of the Bureau of Prisons to the COVID-19 virus, defendant's request for Compassionate Release is DENIED.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 15, 2021